David W. WION, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 7199.

United States Court of Appeals
Tenth Circuit.

Dec. 12, 1963.

Lawrence G. Empey, Denver, Colo., for appellant.

Lawrence M. Henry, U. S. Atty. (Robert S. Erdahl, Attorney for Department of Justice, on brief), for appellee.

Fred Cohen, Denver (Walter L. Gerash, Denver, Colo., on brief), for Colorado Psychological Ass'n, amicus curiæ.

Before MURRAH, Chief Judge, and PICKETT, LEWIS, BREITENSTEIN, HILL and SETH, Circuit Judges, en banc.

MURRAH, Chief Judge.

This is an appeal from a conviction and sentence on an indictment which charged that appellant Wion, did "knowingly cause to be delivered by mail to Mildred Tandy at Eckert, * * * Colorado, * * * an explosive, with intent to kill or injure [her]," in violation of 18 U.S.C. § 1716. The appellant does not seem to deny the sufficiency of the record evidence to support the verdict of guilty. He does contend that the trial Court erroneously denied his motion to suppress incriminating evidence, on the ground that it was obtained pursuant to a search and seizure without a warrant and without his requisite consent. And, on the further ground that the Court erroneously denied his motion to provide appointed counsel with funds necessary for the proper preparation of his defense. Finally, the appellant renews his challenge to the instructions of the Court, concerning his mental capacity to commit the crime charged.

On the pre-trial motion to suppress, the established and basic facts are to the effect that on the 17th day of January, 1962, Mildred Tandy received a package, delivered to her by mail at Eckert, Colorado from Sacramento, California. While she was opening the package, it exploded causing bodily injury to her. The indictment was returned in the District of Colorado on January 23, 1962, and the postal inspectors in Denver, Colorado notified the postal inspectors in Sacramento, informing them that the warrant had been issued and was being mailed to Sacramento. Upon receipt of this information and before receipt of the warrant, four postal inspectors went to an apartment occupied by Wion and his twenty-year-old son in Sacramento. They arrested Wion and immediately searched without a warrant, his apartment and an automobile belonging to his son, located on the streets near-by. They seized four pair of "electrical pliers" in the apartment, three of which belonged to the son, and one pair apparently belonged to the father. They took some other tools from a box in the trunk of the automobile, including a fifth pair of pliers belonging to Wion, all of which was introduced in evidence over Wion's objection.

There was evidence to the effect that on the 20th day of January, before the indictment was returned on January 23rd, two postal inspectors went to the apartment occupied by Wion and his son in Sacramento. They talked to Wion about Mrs. Tandy, and asked him some questions, but no search of any kind was made. When, after the indictment, they returned to the apartment on January 23rd, two of the inspectors were first admitted by Wion in the presence of his son, and upon signal, the other two inspectors followed.

Wion testified that he told the inspectors they could not search the apartment without a warrant, but that they unbuttoned their coats, put their hands on their guns, and told him that they had a right to search the apartment without a warrant and proceeded to do so. The son testified that he rented the apartment and it was occupied by him and his father, and that the inspectors were first told they could not search without a warrant, but that after some conversation, he finally gave permission for the search of the apartment and offered to allow the inspectors to search his automobile, which they did with his cooperation. He denied that he was "intimidated" or "frightened."

The officers testified that upon entering the apartment, they told Wion of the indictment in Colorado; that he was being placed under arrest on that charge; that in due course, he would be taken before the United States Commissioner in

Sacramento; and, that when Wion protested his arrest or search without a warrant, he was told that the arrest was quite proper, and that they proposed to search his immediate effects, whereupon Wion and his son both consented and cooperated completely and fully in the conduct of the search of the small apartment. The officers denied that their firearms were exhibited in any manner, or that Wion was coerced in any way.

The trial Court observed that while the evidence indicated that Wion consented to the search and seizure, it was sustained as having been "made contemporaneously with and incidental to the lawful arrest, and the materials taken were not entirely without relation to the charge."

 Wion occupied the premises searched. The search was directed to him, and he had standing to challenge the legality of the search by motion to suppress the articles seized. See: Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; and Villano v. United States (10 CA), 310 F.2d 680. Cf. Williams v. United States (Meier v. United States) (10 CA), 323 F.2d 90. Following Jones, we left no doubt in Villano that this Court would view with caution and misgivings any search based upon a consent given after arrest, and under circumstances indicating intimidation or coercion of any kind. The consent must be freely given, and we will indulge in "every reasonable presumption against waiver." United States v. Page, 9 Cir., 302 F.2d 81, 84. But, we agree with the trial Court that the search of the apartment was made as an incident to the lawful arrest of Wion. He had been indicted for a felonious crime, and a warrant had been issued. The postal inspectors had reasonable cause to believe that Wion had committed the offense. There was probable cause for the arrest, and if the search was not consented to, it was conducted without intimidation or coercion, and was reasonably incident to the arrest.

 The appellant suggests that postal inspectors have no authority to make an arrest, i. e., see: United States v. Helbock, D.C., 76 F.Supp. 985; and United States v. Hass, D.C., 109 F.Supp. 443; and, that the search could not, therefore, have been incident to a lawful arrest. But, even a private person is authorized to make an arrest in California, under circumstances like these. See: California Penal Code, Sec. 837(3).[1] We think the search of the apartment was reasonably incident to a lawful arrest, and it is plain beyond doubt that the automobile, belonging to the son, was searched with his consent freely and voluntarily given.

 On the question whether the failure to provide defense counsel with funds with which to make investigations in California was prejudicial to the rights of Wion, to a fair and impartial trial, the record shows that all of the exhibits, and for that matter, all of the demonstrative evidence introduced against the defendant, were made available by the Government before trial, for inspection by counsel for the defendant, under F.R. Crim.P., Rule 16. When the question arose concerning the relevancy of a certain quantity of dynamite and detonators in California, arrangements were made for defendant to designate some person to inspect it on his behalf, and counsel was advised that if, after inspection, he believed that there was a matter at issue, as to which expert testimony would be relevant, application could be made to the Court for the production of that testimony, under the Rule. With respect to payment of counsel's expenses to California, the Court observed that, in the first place, there were no funds available for the payment of expenses, and called attention to Mr. Wion's statement that he had $300 in cash and was

1. *Section 837. California Penal Code. "Arrests by Private Persons. [Circumstances authorizing].* A private person may arrest another * * * 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it. (Enacted 1872.)"

the payee on two notes, on which monthly payments were being made. Counsel for the defendant then stated that he would make further investigation, to determine if the defendant had funds readily available to pay the necessary expenses. The Court concluded the conference by stating that he would be available for "any conferences or hearings that may be necessary, in order that you may be prepared in this case, so far as it is possible, for the trial date on June 19," and that counsel "may feel free to call upon me at any time, if there are any matters that need further Order." There was no further application to the Court for orders in aid of investigation in California, and the Court was not asked to make any further orders for production of any evidence deemed relevant to the defense of the charge against Wion.

■ The record of the trial proceedings indicates beyond question that the accused was effectively represented by able counsel, at every step of the proceedings against him, and that the trial Court maintained a solicitous regard for the rights of the defendant throughout the trial of the case.

The mental competency of the defendant to commit the offense charged was put in issue. And, the trial Court instructed the jury with commendable clarity, that the mental competency of the accused to commit the offense was an essential element of the crime charged, and like all other essential elements, must be proved by the Government beyond a reasonable doubt; that before convicting the accused, the jury must be satisfied beyond a reasonable doubt not only that the accused did the acts charged, which constitute the crime, but that they

were done by a person mentally capable of committing the offense; and, that if they had a reasonable doubt of the defendant's mental competency at the time of the offense, he must be acquitted. The Court then proceeded to define mental incompetency in terms of criminal responsibility verbatim, in accordance with a recent decision of this Court, as meaning, " * * * such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of his act, or though conscious of his conduct and able to distinguish between right and wrong, and knowing that the act is wrong, yet his will—by which is meant the governing power of his mind—has been involuntarily so completely destroyed that his actions are not subject to it but are beyond his control." Coffman v. United States, 10 Cir., 290 F.2d 212, 215. More simply and understandably stated, the test is whether, at the time of the commission of the prohibited act, the accused was mentally capable of knowing and distinguishing the difference between right and wrong, and knowing that the act was wrong, was mentally capable of controlling his conduct. In legal parlance it may be referred to as the modern adaptation of the M'Naghten Rule,[2] i. e., right-wrong, as modified and supplemented by the "irresistable impulse test." See: Feguer v. United States, 302 F.2d 214, 244, wherein the Eighth Circuit epitomizes the essential constituents of legal sanity, under the modern version of the M'Naghten Rule, as the defendant's "cognition, volition and capacity to control" his behavior, or "knowledge, will and choice." [3]

2. The M'Naghten Rule: 10 CL and F. 200, 210, 8 Eng.Rep. 718, 722. " * * * to establish a defense on the ground of insanity, it must be clearly proved that at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did

know it, that he did not know he was doing what was wrong."

3. See also: M'Naghten, Durham and Psychiatry, by Howard P. Rome, M.D., presented to the Eighth Circuit Judicial Conference, July 25, 1963, at Rochester, Minnesota, 34 F.R.D. 93.

The Court was requested to instruct the jury on the issue of insanity, in accordance with the test prevailing in the Third Circuit since United States v. Currens, 290 F.2d 751, to-wit: that if the jury "believe beyond a reasonable doubt that the defendant Wion was not suffering from a disease of the mind at the time he committed the criminal act charged, you may find him guilty. If you believe that he was suffering from a disease of the mind, but believe beyond a reasonable doubt that at the time he committed the criminal conduct with which he is charged he possessed substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated you may find him guilty. Unless you believe beyond a reasonable doubt that Wion was not suffering from a disease of the mind or that despite that disease he possessed substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated, you must find him not guilty by reason of insanity * * *."

Since the trial Court's instructions on criminal responsibility were strictly in accordance with the rule of this Circuit, as most recently announced in Coffman, the judgment must be affirmed unless this Court is disposed to recede from it, for the rule embodied in the requested instruction, on the ground that our rule is not in conformity with present-day psychiatric concepts of criminal responsibility. Since criminal responsibility in Federal courts is a rule of decision, based upon common law concepts, it is always appropriate to re-examine and reappraise the rule, in the light of the considerations which prompted other Federal courts to abandon M'Naghten, for what they believe to be a more enlightened rule for determining responsibility for criminal conduct. The question having been squarely put on the record in this case, the Court was convened en banc to re-examine our prevailing rule, in the light of the adjudicated decisions and prolific writings on the subject. The case has been submitted on briefs and oral argument by competent appointed counsel, and the Colorado Psychological Association has also submitted able brief and oral argument in opposition to the prevailing rule.

The trial Court in Currens was requested to instruct in accordance with the right-wrong test of M'Naghten, and apparently in the alternative, to instruct in accordance with the rule of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, to the effect that, in order to convict the accused of the offense charged, the jury must believe beyond a reasonable doubt that the accused was not suffering from a disease or defective mental condition, at the time he committed the criminal act charged, or if they believed he was suffering from a defective mental condition when he committed the prohibited act, that such act was not the product of his mental abnormality. The trial Court instructed the jury in accordance with the right-wrong test of M'Naghten, and added what the appellate Court referred to as "glosses of temporary insanity and irresistable impulse." Currens, supra, 290 F.2d p. 763. The appellate Court treated the right-wrong test as the "back bone" of the charge, and the distinguished Chief Judge of the Third Circuit,[4] with characteristic clarity and erudition, traced the long and tenuous history of the M'Naghten Rule, as it has found its way and place into the criminal laws of this country. He eloquently portrays the right-wrong test of M'Naghten as archaic, unrealistic and unworkable, in the light of modern psychiatry and penology. He cites extrajudicial statements of members of the United States Supreme Court, i. e., see: Currens, supra, 290 F.2d p. 765, and refers us to psychiatric and psychological writings, most of which have condemned the right-wrong test as putting the "testifying

4. Chief Judge Biggs is also the author of the famous work entitled, THE GUILTY MIND (Harcourt, Brace & Co., 1955).

psychiatrist in a strait-jacket." Currens, supra, p. 767.[5]

Judge Biggs, in Currens, rejected the so-called mental "disease-defect-product test" of Durham, for failure to provide a standard or formula by which the jury can answer the ultimate question, whether the defendant possesses the necessary guilty mind to commit the offense charged, i. e., the capacity to control his behavior and choose between alternative courses of conduct. See: Currens, supra, p. 773. See also: Judge Burger, concurring in Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 857. In sum, Judges Biggs and Burger rejected Durham as committing the standards of criminal responsibility to the vagaries of psychiatric formulations.[6]

Having rejected both M'Naghten and Durham in Currens, Judge Biggs proceeded to define criminal responsibility for the guidance of his Circuit, and it now appears that this definition is, or will be, substantially incorporated in the American Law Institute's Model Penal Code, to-wit: "Section 4.01. Mental Disease or Defect Excluding Responsibility. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." Final Draft, 1962. Judge Biggs does not tell us whether, or to what extent, the so-called right-wrong test of M'Naghten, when coupled with irresistible impulse, fails to meet the essential requirements of the capacity to conform test in Currens.[7]

It seems to be agreed that the governing principle for determining sanity under M'Naghten, first decided in 1843,

5. In his comments on Psychiatry And The Law, made to the Tenth Circuit Judicial Conference, 1962, at Wichita, Kansas, Judge Biggs stated: "The vast absurdity of the M'Naghten Rules is demonstrated by the fact that in order to determine the sanity or insanity, the mental health or lack of it of the defendant, the attention of the court, the jury and the psychiatrist is centered upon a single question: did the accused know the difference between right and wrong? The question also requires a moral judgment by the testifying psychiatrists, by the court and by the jury." 32 F.R.D. 547, 550. See also: McNaghten To Currens, And Beyond, by Bernard L. Diamond, M.D., 50 Cal.Law Rev. 189; McNaghten, Durham And Psychiatry, by Howard P. Rome, M.D., Footnote 3; Law And Pyschiatry Must Join In Defending Mentally Ill Criminals, by Mr. Justice Brennan, 49 ABAJ 239; The Durham Rule: A Meeting Ground For Lawyers And Psychiatrists, by Mr. Justice Douglas, 41 Iowa Law Rev. 485; and, Criminal Responsibility: A Psychiatrist's Viewpoint, by Winfred Overholser, M.D., 48 ABAJ 527.

6. We do not know whether Judge Biggs would now object to the Durham concept, as subsequently modified in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, wherein the District of Columbia Court supplemented Durham to make it clear that neither the Court nor the jury is to be bound by the ad hoc psychiatric definitions of mental disease or defect; that the meaning of those critical words, for the purposes of criminal responsibility, is a legal and not a medical problem; and, that the jury should be told that mental disease or defect includes " * * * any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. * * *" Since Judge Burger concurred in the McDonald opinion, we take it that his objections to Durham, voiced in Blocker, were met in McDonald. Durham is almost textually identical to the rule announced in State v. Pike, 49 N.H. 399, decided in 1869, holding that an accused is not criminally responsible "if the [unlawful act] was the offspring or product of mental disease." Two years later, and in 1871, the New Hampshire court in State v. Jones, 50 N.H. 369, modified its rule by adding to the disease-product test the element of capacity to control. Thus, McDonald appears to be comparable to the control element set forth in Jones.

7. We understand Judge Burger to maintain that the A.L.I. test is the basis for the Currens test, and that the A.L.I. test is " * * * essentially M'Naghten plus irresistible impulse recast in modern terminology, * * *." He says that "ir-

is cognition, i. e., the capacity of one to know and appreciate the nature and quality of his act, and to know that it was wrong. To cognition, we have now added, what in legal parlance is called irresistable impulse, but what psychiatrists and Judge Biggs call volition or behavior control. Thus, in Coffman, we say in self-complicating language, that if the accused does know that his act is wrong, yet by reason of his mental condition, his actions are beyond his control, he is not criminally responsible.[8] If, as Judge Burger seems to think, the A.L.I. test is essentially the modern adaptation of M'Naghten and is not demonstrably different from Currens (see: Judge Burger's comments, Footnote 7), our differences are purely semantical for, as we have seen, Coffman is not essentially different from the A.L.I. test. This being so, we need only find words to translate our legal formula to the man-on-the-street juror, so that he may intelligently apply the test to relevant medical testimony in determining the ultimate question of criminal responsibility. We are content to adhere to Coffman, in the more simplified and understandable language of the A.L.I. formula.

This reconciliation of semantical differences would seem to settle the matter to the satisfaction of both law and psychiatry, but Judge Biggs and some psychiatrists seem to insist that the inclusion of right-wrong, as an element of cognition in any test for determining criminal responsibility, is unacceptable because it "requires a moral judgment by the testifying psychiatrist, by the court and by the jury." See: Footnote 5. It is at this point and upon this premise that we reject Currens, as a test of criminal responsibility in this jurisdiction. And, we do so because of our unwillingness to concede that the law is unconcerned with the morals of one's conduct, for purposes of determining criminal responsibility. We proceed on the fundamental premise that moral responsibility and moral sanctions are the warp and woof of the law, and that " * * * complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are different." Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665, 667. See: Judge Burger concurring in Blocker, supra, 288 F.2d p. 868. This dichotomy is inherent, we think, in the recognition, born of experience from Durham, in McDonald, that the test of criminal responsibility is "a legal and not a medical problem." See: Footnote 6. To borrow the language of Chief Justice Weintraub in State v. Lucas, 30 N.J. 37, 152 A.2d 50, 75, " * * * [o]ur social order accepts a postulate, held in varying degrees by most citizens and buttressed by religious tenet, that every man is endowed with the capacity to choose a correct course of behavior so long as he is able to detect it. In separating the sick from the bad, we start with the indisputable ability of man to adhere to the right. Upon that assumption, M'Naghten is unassailable." And, we will all agree with Judge Bazelon in Durham, that the " * * * legal and moral traditions of the western world require that those who, of their own free will and * * * intent * * * commit acts which violate the law, shall be criminally responsible for those acts." Durham, supra, 214 F.2d p. 876. Only one proposition

---

resistible impulse has always been a misleading concept because it has connotations of some sudden outburst of impulse and completely overlooks the fact that people do a lot of weird and strange and unlawful things as a result of not just sudden impulse but long brooding and disturbed emotional makeup." See: Judge Burger's comments on Psychiatry And The Law, presented to the Tenth Circuit Judicial Conference, 1962, at Wichita, Kansas, 32 F.R.D. 547, 560.

**8.** It is interesting to note that the words, "irresistible impulse" are not used in any of the instructions defining criminal responsibility. They are merely symbols of what we more accurately describe in instructions as capacity to control or conform conduct.

seems certain, i. e., that " * * * [s]anity and insanity are concepts of incertitude." Frankfurter, J., Leland v. Oregon, 343 U.S. 790, 803, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302.

This leads us to suggest that the emphasis on psychiatry at the point of criminal responsibility is misplaced. In most cases where irresponsibility is in issue, the commission of the prohibited act is not disputed, and the question whether the accused is to be excused as mentally irresponsible, or is to be held accountable, does not solve the problem. In either case, the law must in some way protect the community by rehabilitation or isolation.[9] This involves the sentencing function, which is the ultimate responsibility of the Court, as an instrument of the social order. It is at this point that the behavorial scientists can be of most help to the Court, and to the offender as well. And, we will all concede that what is best for the offender is best for society, for in most cases, the offender is eventually returned to society, either fit or unfit.[10]

Some of the behavioral scientists agree that a sense of responsibility is therapeutically essential to rehabilitation, viz., to tell a person that he is not responsible for his act is likely to deter and complicate his rehabilitation, while, to tell him that he is legally responsible for his conduct, but that because of his mental illness, he is subject to treatment as a part of the sentencing process, is more consistent with reality and more likely to aid in his rehabilitation.[11] This would seem to be especially true with the psy-

---

9. The offender who is excused as mentally irresponsible, must be subject to civil process, pursuant to which he is confined until he can be safely returned to society. Unlike the District of Columbia, (see: D.C.Code, § 24-301 [d]) and most states, Federal law provides only that one who is found to be mentally incompetent to stand trial or be sentenced for an offense against the laws of the United States shall be committed to the custody of the Attorney General, until his mental competency shall be restored, or so improved that he may be released, without endangering the safety of the "officers, the property, or other interests of the United States, or until suitable arrangements have been made for the custody and care of the prisoner by the State of his residence * * *." Public Law No. 285, 18 U.S.C. §§ 4244-4248. See: Greenwood v. United States, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412. As Dr. Settle, Superintendent of the Medical Center for Federal Prisoners, at Springfield, Missouri, has said, "we just operate a holding operation. If recovery does not ensue, the offender must be turned over to his State." See: Comments made to the Tenth Circuit Judicial Conference, 1962, 32 F.R.D. 481, 554.

10. Judge Burger has recently suggested that we " * * * shed some of the maudlin sentimentality about the stigma of a guilty person on a psychopath or sociopath and concentrate on putting him out of harm's way while trying to treat him in the hope, however remote it may be, that we can restore him to society."

And, that " * * * perhaps we ought to give some thought to dropping the fiction that we call the 'defense of insanity' and use the criminal trial to determine simply whether a defendant committed the particular action charged in the indictment which would constitute a crime if he had the mens rea; the criminal intent. Then after this issue has been resolved by the conventional processes, let the court, with the aid of psychiatrists, probation officers' reports, and other aids of the modern judicial system, decide on what to do with this man in the best interest of society and the man in terms of rehabilitation." See: Proceedings of the Sixth Annual Meeting of the National Conference of State Trial Judges, Chicago, Illinois, August 9-11, 1963. At the same time and in the same forum, Sir William John Kenneth Diplock, Lord Justice of Appeal of Great Britain, and Privy Council member, observed that "[t]he policy which has been adopted in England is to deal with the case of the prisoner who suffers from mental disorder or disability, sociopathy, or whatever it may be, after conviction * * *." He went on to say that this procedure, " * * * removes from the arena of the adversary system the difficult and delicate medical and psychiatric problems which are involved. It enables the medical witnesses to give their evidence without [partiality], without any feeling of partisanship on either side."

11. "Treatment for a delinquent must begin with a clear-cut realization on his part that he is a responsible person who

chopathic and sociopathic personality.[12] It is these considerations which have prompted some of our most renowned psychiatrists to recommend the establishment of a diagnostic center as a part of our penal system—the psychiatrists' laboratory, if you please—where the behavorial scientist can make his very best estimate " * * * of the [offender's] personality, his liabilities and his assets, and tries to develop the latter." See: Dr. Karl A. Menninger's remarks on Psychiatry And The Law, presented to the Tenth Circuit Judicial Conference, 1962, 32 F.R.D. 481, 574. And, Dr. Joseph Satten, of the Menninger Foundation, tells us that " * * * more and more we psychiatrists are moving away from the philosophical discussions within the courtroom, * * *. We are moving into the hospitals, into the diagnostic centers, into the correctional institutions, and working with parole and probation officers, where we'll be able to deliver the goods in a way that eventually the community can see that certain people can be rehabilitated at a very economical level and others may not be able to be rehabilitated, but can be identified as dangerous." See: Dr. Satten's remarks to the Tenth Circuit Judicial Conference, 1962, 32 F.R.D. 481, 582. Dr. Diamond tells us that " * * * it makes more sense to focus reform efforts direct-

ly upon the total system of administration of criminal justice, and thus attempt to cope with the bulk of anti-social deviation in constructive, humane, and effective ways. From such a viewpoint, the solution is not to make new laws that will displace large portions of the prison population into mental hospitals, which then become prisons in disguise. Rather, it would be better to transform correctional systems and prison institutions into fit places to which mentally ill persons may be sent for treatment, rehabilitation, and eventual restoration to a normal life in their families and communities." From M'Naghten To Currens, And Beyond, 50 Cal.Law Rev. 189, 205. And see: M'Naghten Remains Irreplaceable: Recent Events In The Law Of Incapacity, by Professor Gerhard O. W. Mueller, 50 Georgetown Law Review 104; and The M'Naghten Rules And Proposed Alternatives, by Professor Jerome Hall, 49 ABAJ 960.

It is this basic concept of the administration of criminal justice, which prompted the Council Of Judges, of the National Council On Crime And Delinquency,[13] to promulgate a Model Sentencing Act. The basic purpose of the Model Act is to provide a diagnostic center for the detection of the dangerous offender, and to insure his incapacity, where the Court finds that the accused

---

has a considerable role in his own destiny. By the very implication that delinquents can change, they are assumed to be responsible. It is hard to conceive of any form of psychotherapy that can succeed unless the individual is regarded as a person who can assume responsibility for his acts." Juvenile Delinquents: "Sick" or "Bad"?, by Seymour L. Halleck, M.D., Journal of the Social Work, Vol. 7, No. 2, p. 58, 59.

12. Some behavioral scientists believe that the " * * * arbitrary division of criminal offenders into two classes of the sane and insane no longer makes any sense;" and, that "responsibility as a concept is losing its usefulness as a moral judgment and is acquiring a new, and much more valuable, therapeutic meaning. Thus, with many mentally ill persons, one may speak of their 'extended responsibility.' Extended responsibility means that

mentally ill persons are to be treated as if they were more responsible for their actions than they really may be, simply because it is therapeutically and socially desirable to do so." From M'Naghten To Currens, And Beyond, see: Footnote 5.

13. The Council Of Judges is a group of 50 judges from all levels of the judiciary, state and federal, and from all parts of the country. Functioning as an adjunct of the National Council On Crime And Delinquency, it has promulgated Guides For Sentencing, Guides For Juvenile Court Judges, Procedure And Evidence In Juvenile Courts, and more recently a work entitled, The Law Of Criminal Correction. These judges have worked together to provide the Model Sentencing Act, based upon their experience and study of the problems in sentencing.

is "suffering from a severe personality disorder indicating a propensity toward criminal activity." Model Sentencing Act, Section 5. This definition of the dangerous offender follows closely the Durham philosophy, at the point of disposition.[14] In sum, the Model Act would empower the Court to formulate a sentence to fit the offender. If found to be dangerous, he may be permanently incapacitated. If found to be rehabilitable, either by supervised probation or suitable institutionalization, the sentence may be patterned accordingly.

 This brings us to the point of adherence to our concept of criminal responsibility, as stated in the instructions of the trial Court, and as refined and restated in Section 4.01 of the A.L.I. Model Penal Code (1962 Proposed Final Draft). When as here, therefore, the mental capacity of the accused to commit the offense charged is put in issue,[15] the jury is to be told in substance that it is an essential element of the crime charged; that before convicting the accused, the jury must be satisfied beyond a reasonable doubt not only that the accused committed the unlawful act, but that he was criminally responsible for his conduct; and, that a person is not criminally responsible for his conduct if, at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his

conduct to the requirements of the law. The jury is then to be told that, as applied to their case, the test for criminal responsibility means that before they may return a verdict of guilty, they must be convinced beyond a reasonable doubt that at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was wrong, and was mentally capable of controlling his conduct. We think this simple test of criminal responsibility allows the behavioral scientists "full freedom to put their professional findings and conclusions before the court and jury * * *." The Model Penal Code: An Invitation To Law Reform, by Louis B. Schwartz, 49 ABAJ 449; and see: Model Penal Code, Section 4.05(3) (d); Section 4.07(4). For "[e]ven under the right-wrong test, no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense." State v. Carlson, 93 N.W.2d 354, 361. This should go far toward bridging the gulf between psychiatry and the law, if indeed, there is one, and it will also give the trial judge a definition which he can articulate to the lay jury.

The definition of insanity, as embodied in the instructions of the trial Court following Coffman, incorporated all of the elements of the A.L.I. code. No objection was made to the form of the instructions, and the judgment is affirmed.

---

14. A New Approach To M'Naghton v. Durham, by Sol Rubin, Journal Of The American Judicature Society, Vol. 45, No. 7, Dec., 1961; and see Mr. Rubin's remarks to the Tenth Circuit Judicial Conference, 1962, 32 F.R.D. 481, 575.

15. See: Fitts v. United States, 10 Cir., 284 F.2d 108; and Phillips v. United States, 10 Cir., 311 F.2d 204.