**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George M. STEWART, Defendant-Appellant.**

**No. 463–70.**

United States Court of Appeals, Tenth Circuit.

June 16, 1971.

John A. Babington, Asst. U. S. Atty.,
Albuquerque, N. M. (Victor R. Ortega,
U. S. Atty., Albuquerque, N. M., with
him on the brief), for plaintiff-appellee.

Larry L. Lamb, Albuquerque, N. M.,
for defendant-appellant.

Before LEWIS, Chief Judge, ADAMS,
Circuit Judge*, and BROWN, District
Judge.

WESLEY E. BROWN, District Judge.

Appellant Stewart, was charged in the District Court for the District of New Mexico in a two-count indictment with unlawful sale of dilaudid, a narcotic drug, in violation of 26 U.S.C. § 4705(a), and an unlawful sale of desoxyn, a stimulant drug known as "speed," in violation of 21 U.S.C. § 331(q) (2). Both of these sales were made on June 5, 1969, to an undercover agent in Albuquerque, New Mexico. At the first trial, the jury could not agree, and a mistrial was declared. A conviction followed Stewart's second trial, and in this appeal from the judgment and sentence, he contends that the government failed to establish his competency, beyond a reasonable doubt, and that he is entitled to a judgment of acquittal on the ground of insanity. In addition, Stewart also contends that the admission and playback of a tape recorded conversation between Stewart and an agent was so prejudicial that he is entitled to a new trial.

Stewart is a medical doctor and a psychiatrist, and at the time of trial he was employed as a staff psychiatrist at Agnew State Hospital, San Jose, California, at a salary of $25,000 per year. The mechanical transactions of the two drug sales were not disputed. The agent made arrangements to meet Stewart at his office, he named the drugs he wanted and the quantities, and he simply wrote out the prescriptions, without question. There was no semblance of a doctor-patient relationship. Stewart charged the agent $10.00 for writing the two prescriptions. The quantity of Dilaudid tablets in the prescription were worth up to $150.00 "on the street."

Agent Robinson testified that on this occasion Stewart was casually and neatly dressed, he did not look disheveled, he did not appear to have been drinking, his eyes were normal, he appeared normal in all respects, he was not disassociated as to time and place, and that "if he was under the influence of any drugs, it did not appear to affect any of his acts or motions." [Tr. 96]

In addition to the testimony of the agents, the government also presented testimony of a druggist who had filled numerous other questionable prescriptions which had been written by Stewart. This druggist testified that he became so concerned about the type of prescriptions written by Appellant that he contacted the Inspector of the State Board of Pharmacy.

With the testimony of the agents, the druggist, and a stipulation as to the chemical content of the drugs, the government rested its case.

Stewart's sole defense was insanity. The jury was properly instructed in this

---

* Of the Third Circuit, sitting by designation.

regard, according to the standards set out by this Circuit in Wion v. United States (1963) 325 F.2d 420, cert. den. 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309, no issue concerning this instruction is presented on this appeal. The government does not contend that the evidence of mental illness present in the case was not sufficient to dissipate the legal presumption of sanity, and it is clear in this instance that the government carried the burden of proving criminal responsibility as an essential element of the offense, beyond a reasonable doubt. Phillips v. United States (10th Cir. 1962) 311 F.2d 204.[1] We are thus faced with the question of whether or not the evidence was sufficient to make out a case for the jury, that is, was Stewart, on June 5, 1969, mentally capable of knowing what he was doing, knowing that it was wrong, and mentally capable of controlling his conduct.

The defense presented testimony of two psychiatrists, Dr. Jacobson and Dr. Slenger, a clinical psychologist, Dr. Calvert, and that of Stewart and his wife. A review of this evidence indicates a periodic history of erratic and bizarre behavior on the part of Stewart, dating back to June, 1967.

Mrs. Stewart testified that from this date, shortly after the birth of their last child, the behavior of her husband changed drastically from that of a good and loving father and husband to that of a person who seemed bent on destroying everything that he owned, his car, his home, his family, and his medical practice. Incidents included constant minor automobile mishaps, deliberate flooding of parts of his home, setting the patio behind the home on fire with kerosene; breaking doors, chopping a light switch out of the wall with an axe; throwing garbage in a neighbor's swimming pool, for which he was arrested; vicious physical attacks upon his wife and children, requiring police aid on one occasion; burning all of his clothes in the fireplace; marching in his Army uniform to Sousa in the middle hours of the night. She testified that he refused to eat food she prepared, would shut himself in his room and sleep for days at a time; that he forgot appointments, refused to call his patients, and caused a decline in his practice so that by January, 1969, he had no secretary, and his income was drastically reduced. Since this type of behavior led to a separation in September, 1968, Mrs. Stewart was unable to testify as to her husband's condition on June 5, 1969. Her testimony reflected, however, that her husband's behavior was episodic, and that he had his "good days." She further stated that when Stewart attended his daughter's high school graduation on June 2, 1969, he seemed normal and acted in a proper manner.

Stewart testified that he had received some psychiatric treatment in the Army in 1943, in 1956 at Walter Reed Hospital, where he was found to have a "cyclothymic personality," and briefly, in 1964. He stated that in 1967 he began to drink heavily and to use numerous types of drugs and medicine, including cerebral stimulants, marihuana and LSD, dexadrine, Miltown and Equanil, hormones, Petrófrane, a mood elevator, chloralhydrate, a sedative, anti-histamines, demerol, and alcohol with nembutol and seconal. After his wife sued for divorce and had him evicted from the home, he was treated by a psychiatrist from September 1968 until early Spring, 1969, at which time he ceased treatment. He stated that he had no memory of the various incidents related by his wife, and that he had no recollection of the transactions which occurred on June 5, 1969. He further testified that some two days after the sales transactions, he crashed his car into a parked auto and sustained a broken arm and brain concussion. There then came a reconciliation

1. "Under the established rule in this Circuit, any relevant evidence of mental illness before or after the offense is sufficient to dissipate the legal presumption and cast the conventional burden on the government" Phillips v. United States (10th Cir. 1962) 311 F.2d at 205.

with his wife, he stopped drinking and taking drugs, and although he lost his New Mexico license, he was able to obtain employment at the California State Hospital. At the time of trial, he was under treatment of a psychiatrist, but he testified that he and his employers believed that he was doing a competent job. He was unable to say whether or not he was taking drugs between June 1st and June 5th.

Dr. Slenger, a psychiatrist, testified that he had been casually acquainted with Stewart since October, 1967. He testified that in his opinion Stewart suffered from a "control problem," or loss of "executive control"—that is, a loss of the governing part of his mind in June, 1969.

Dr. Calvert, a psychologist and specialist in the treatment of children afflicted with dyslexia and neurological problems, testified concerning his acquaintance with Stewart from 1964 until June, 1969. During that time Stewart was employed as a medical consultant by Dr. Calvert and kept weekly appointments with patients at the Calvert Clinic. Dr. Calvert testified that in January, 1969, he began to notice a definite deterioration in appellant's condition; he missed appointments or forgot them, became alternately hyperactive and depressed, careless in dress, lacked attentiveness, and failed to follow through with pre-agreed treatment of patients. By the end of April, Dr. Calvert became really concerned, and noticed that on occasions Stewart appeared to have been drinking. While Dr. Calvert would not say that Stewart completely lost control, he stated that he seemed to have a compulsion to please, was extremely suggestive, that "his judgment was affected," and Dr. Calvert suspected that he was taking drugs. He also testified that appellant's behavior came in episodes. Although Dr. Calvert believed that he had seen Stewart on June 4th, his regular day at the Clinic, he could not recall his condition on that date, and was unable to testify as to his mental condition on June 5, 1969.

Dr. Alan Jacobson, a psychiatrist, examined Stewart on December 5, 1969, at the request of the government. At trial, he was called as a witness for the defense, testifying to his acquaintance with Stewart from 1963 to 1969, and his conclusions as to his mental condition.

Dr. Jacobson was of the opinion that Stewart was capable of functioning to the point that, in outward appearance, he would appear normal, and that if he was not drinking, and not taking drugs, he was capable of practicing "adequate medicine." On cross-examination by the prosecution, the doctor further testified: [Tr. 243]

"I would not consider Dr. Stewart a psychotic individual. I would also venture the opinion that there have been times when, under the influence of drugs, whether alcohol or some other drug, his loss of control has been such as to temporarily constitute what might be considered a psychotic state."

The government recalled Dr. Jacobson in rebuttal as a witness for the prosecution with reference to the *Wion* standards of mental capacity. In this examination, Dr. Jacobson was able to state that in his opinion, Stewart on June 5, 1969, was mentally capable of knowing what he was doing, capable of knowing that it was wrong, and that "within reasonable medical probabilities," he was capable of controlling his conduct on that date.

The government also called Officer Rita Last, an undercover agent with the Albuquerque police department, as a rebuttal witness. She testified that she and another agent, Fernandez Baca, purchased prescriptions from Stewart on June 5, 1969 for Desoxyn and Codeine. On the following day, June 6th, she contacted Stewart by phone and later called on him at his office, and her conversations with him on that date were secretly tape recorded. Over objection of the defense, these tapes were played to the jury, which was carefully instructed that this evidence was admitted only for the purpose of determining Stewart's

competency on June 5th, and as to the question of specific intent. Officer Last testified that appellant appeared normal on the date of her visit; that he did not appear to be drunk, and she did not notice alcohol on his breath, that he appeared "very professional;" that he did not seem out of touch with reality or with his mind elsewhere. Neither Officer Last nor Agent Robinson purported to state a lay conclusion as to whether or not Stewart was sane or insane.

In determining whether Stewart is entitled to a judgment of acquittal, we consider the evidence in a light most favorable to the government, together with reasonable inferences which may be drawn from the facts, and to determine whether there was substantial evidence upon which the jury might reasonably base a finding of guilt beyond a reasonable doubt. Nickles v. United States (10th Cir. 1967) 381 F.2d 258.

■■ Stewart concedes that the evidence was sufficient to establish the first two *Wion* tests, that is, that he knew what he was doing at the time he wrote the prescriptions, and that he likewise was aware of the wrongfulness of his conduct. The question before us is whether or not the government failed to prove to the satisfaction of a reasonable juror, beyond a reasonable doubt, that Stewart possessed the capacity to control his actions on June 5, 1969. The standard for determining such question is set out in United States v. Westerhausen (7th Cir. 1960) 283 F.2d 844, 852 in the following language:

"In criminal cases involving defendant's insanity, in order to remove a case from a jury's consideration, a court must conclude that on the basis of the evidence in the case before it, reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and that reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime. * * *

"The quantum and nature of proof the government must offer to take the case to a jury varies in different situations and to some degree depends upon the quantum and nature of proof that defendant offers."

In support of his position, appellant relies upon the decisions of this Circuit in McKenzie v. United States (10th Cir. 1959) 266 F.2d 524; Fitts v. United States (10th Cir. 1960) 284 F.2d 108; and Phillips v. United States (10th Cir. 1962) 311 F.2d 204, in which convictions were reversed and judgments of acquittal were ordered on grounds of insanity. Similar results were reached in Pollard v. United States (6th Cir. 1960) 282 F.2d 450; United States v. Westerhausen, *supra*, 283 F.2d 844; Buatte v. United States (9th Cir. 1964) 330 F.2d 342; Argent v. United States (5th Cir. 1963) 325 F.2d 162; and in four decisions from the District of Columbia, Wright v. United States (1957) 102 U.S.App.D.C. 36, 250 F.2d 4; Fielding v. United States (1957) 102 U.S.App.D.C. 167, 251 F.2d 878; Hopkins v. United States (1959) 107 U.S.App.D.C. 126, 275 F.2d 155; and Isaac v. United States (1960) 109 U.S.App.D.C. 34, 284 F.2d 168.

In *McKenzie* the court held that the meager testimony of lay witnesses to the effect that defendant appeared "normal" was insufficient proof of sanity in the face of "overwhelming" evidence of insanity offered by the defense. In *Fitts,* the prosecution offered no evidence to rebut the defendant's evidence of a recent commitment in a mental hospital. In *Phillips,* the defendant offered five witnesses who testified to a long and continuous history of mental illness—the prosecution offered no evidence in rebuttal. A fair reading of the other cases relied upon by appellant reveals similar factual situations in which the courts found that the prosecution's evidence was simply insufficient to outweigh impressive evidence of insanity.

In this case defendant's evidence of insanity was by no means "overwhelming;" medical evidence revealed that Stewart's psychiatric problems were epi-

sodic. Both Dr. Calvert and Mrs. Stewart, who were in positions to observe his behavior at frequent intervals, testified that he had his "good days." Agent Robinson and Officer Last testified that from their personal observations of Stewart on June 5th and 6th, they believed that he had not been drinking, and that he was not obviously under the influence of drugs. In addition, the jury was able to consider the tape recorded conversations in determining the question of Stewart's intent and competency at the time of the offenses.

Appellant contends that the tape recording and testimony of agents Robinson and Last had no probative effect, and no relevance to the issue of Stewart's ability to conform his conduct to the requirements of the law, and that the recording in particular, was highly prejudicial to the defense. There is no contention that the tape was objectionable on Fourth Amendment grounds. See United States v. White (1971) 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453; Doty v. United States (10th Cir. 1968) 416 F.2d 887, appeal pending; Holt v. United States (10th Cir. 1968) 404 F. 2d 914, cert. den. 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779, rehear. den. 394 U.S. 967, 89 S.Ct. 1303, 22 L.Ed.2d 570.

In support of this contention, Stewart relies upon certain remarks found in this court's decision in McKenzie v. United States, *supra*, 266 F.2d 524. In discussing the value of lay testimony when the accused's sanity is an issue, the Court stated, pp. 526, 527 of 266 F.2d:

> "Two of these witnesses, who worked in a cafe and bar, saw him on the night of August 14, 1954, (the date of the offense) and testified that they noticed nothing unusual about his behavior * * * An F. B. I. agent testified that he questioned the defendant the day after the crime * * * He said that he observed nothing unusual about the defendant and that he answered questions intelligently. None of these witnesses was either ac-

quainted with the defendant or aware of his previous conduct or behavior.

> * * * * * *

> "The prosecution offered no medical testimony that defendant was sane. It relied entirely upon the testimony of non-expert witnesses to whom the defendant was a stranger. The substance of the evidence adduced by these witnesses was that they observed nothing unusual or abnormal about the defendant immediately before or after the alleged crime. This type of evidence has value only when the witness has had a prolonged and frequent opportunity to observe the subject * * * "

Stewart contends that *McKenzie*

> "plainly states that testimony as to an accused's appearance and conduct, testimony that nothing unusual or abnormal was observed by the witness, is of *no value* unless the witness has had prolonged and frequent opportunity to observe the accused." [Emphasis supplied.]

He concedes that such a construction of *McKenzie* would be contrary to the general rule that a lay witness should be able to relate specific objective observations concerning a person's conduct, or behavior at a relevant time. See Mason v. United States (8th Cir. 1968) 402 F. 2d 732, 738, cert. den. 394 U.S. 950, 89 S.Ct. 1288, 22 L.Ed.2d 484. In *Mason*, the Court construed the *McKenzie* opinion to apply only to opinion testimony, and not to testimony recounting a lay witness' observations of an accused's appearance.

The *McKenzie* case must be read in the light of its facts. Defendant there was charged with kidnapping two children in August, 1954. A pre-trial § 4244 examination revealed that he was insane and incompetent to stand trial; he was confined in the Springfield Medical Center from November, 1954 until February, 1958, when he was found competent for trial; Selective Service records revealed that he had been rejected for military service in 1943 because of para-

noid psychosis and other reasons; seven physicians and psychiatrists were of the opinion that McKenzie was a paranoid psychotic on the date of the offense and did not know the difference between right and wrong. The only evidence offered by the prosecution to rebut this medical testimony was that of the lay witnesses described above. In *McKenzie* this court recognized the general rule that lay witnesses may testify as to the sanity of an accused but concluded, that under the circumstances presented in that appeal, such testimony was not sufficient to override the "overwhelming" evidence of McKenzie's insanity; (266 F.2d at 527–528).

"As a general proposition, properly qualified lay witnesses may testify as to the sanity of an accused, and such testimony may be sufficient to satisfy the burden the law places upon the prosecution even though there is expert testimony to the contrary. Upon the whole, however, we are constrained to the view *in this case*, in which the evidence of trained and disinterested psychiatrists, whose duty it was to determine the mental condition of the defendant, is so overwhelming as to his insanity, that if the burden of proving sanity beyond a reasonable doubt has any significance at all, it was not met by the meager evidence of the prosecution." [Emphasis supplied.]

Under the circumstances present in this case, the Court is of the view that the tape recording and officers' testimony was of probative effect and of particular relevance to the question of Stewart's mental capacity. No evidence which reasonably tends to show the mental condition of an accused should be excluded. Wion v. United States, *supra*, 325 F.2d at 430. The tape served as evidence that Stewart was aware of what he was doing and was likewise aware that his conduct was illegal. The testimony of eye-witnesses to his physical condition, and a recording of his actual statements on the occasions in question were likewise relevant and of proba-

tive value to a jury determination of the contested issue—i. e., Was Stewart capable of controlling his conduct on June 5th? This was a factual issue and from all of the evidence, we determine that reasonable men could find beyond a reasonable doubt that Stewart was competent on June 5, 1969.

The Judgment is affirmed.