**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bert Glenn MUNZ, Defendant-Appellant.**

**No. 73-1868.**

United States Court of Appeals,
Tenth Circuit.

Argued July 8, 1974.

Decided Oct. 23, 1974.

---

Donald C. McKinlay, Denver, Colo. (Stephen E. Snyder, Holme, Roberts & Owen, Denver, Colo., on the brief), for defendant-appellant.

Rodney G. Snow, Asst. U. S. Atty., Salt Lake City, Utah (C. Nelson Day, U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

Before SETH and HOLLOWAY, Circuit Judges, and TALBOT SMITH, District Judge*.

HOLLOWAY, Circuit Judge.

This appeal is taken from a conviction and 25-year sentence on an information charging defendant-appellant Munz with robbery of a federally insured bank in Salt Lake City on October 6, 1971, and assaulting and putting in jeopardy the life of a teller by use of a rifle, in violation of 18 U.S.C.A. § 2113(a) and (d). After a hearing and review of a medical report the trial court on February 8, 1972, found defendant competent to stand trial. A jury trial followed on February 16, 1972, resulting in a guilty verdict and judgment was entered thereon. That judgment was vacated by this court on April 30, 1973, and the cause was remanded.[1] This appeal is from an amended judgment of conviction and 25-year sentence entered on July 30, 1973.

At trial the facts concerning the robbery were stipulated.[2] The only issue

---

* Senior District Judge, of the Eastern District of Michigan, sitting by designation.

1. The defendant had prosecuted an appeal from denial of motion to vacate under 28 U.S.C.A. § 2255. The Government moved for remand, indicating that appellant Munz was not advised of his right to appeal at the time of sentencing, and this court vacated the judgment and remanded. At resentencing, after allocution and advice of the right to appeal, a judgment of conviction and sentence for a 25-year term was again entered.

2. The parties agreed that the facts concerning the robbery were essentially as follows:

On October 6, 1971, at approximately 1:45 p. m. defendant Munz entered the bank and went to the cage of teller Nancy Vaughn carrying a 7mm. Mauser rifle and a grocery sack. He showed her the gun, handed her the sack, and told her to fill it up and to hurry up. She placed $1,734.00 in the sack, whereupon Munz said "that's enough," and grabbed the sack and walked through the back door of the bank carrying the gun and sack full of money. Defendant was arrested at 6:35 that evening by FBI agents with $1,730.00 in his possession, including money placed in the sack by the teller.

raised at trial was defendant's mental competence to commit the offense. On this appeal defendant Munz argues that the trial court erred in that: (1) the court's questions and comments during trial and its instructions on the issue of mental competency did not comply with the standard previously promulgated by this court, and (2) the jury was provided with an improper standard for judging defendant's competence as the result of an incorrect and uncorrected statement by the government's expert witness concerning the standard to be applied. From the trial record and the instructions as a whole, we are convinced there was substantial prejudice to the defendant in the submission of the competency issue, and remand for a new trial.

At trial the prosecution undertook the burden of establishing defendant's competence, primarily through the testimony of an examining psychiatrist, Dr. Bliss. He testified that he had examined the defendant at a medical center in January, 1972, taking a medical and psychiatric history, and giving simple psychological tests.

Dr. Bliss concluded that defendant had a very low IQ of 71, and was almost mentally defective, "almost a moron." He determined that defendant was apparently driven by impulses to get money to buy explosives to detonate, which apparently is his source of sexual gratification. He concluded that the defendant was a borderline mental defective, that he probably was a schizophrenic in partial remission, and that he had strong impulses and had been preoccupied for many years with explosives, which apparently has been a dominant theme in his life. He further concluded that defendant had been intermittently psychotic or schizophrenic over the course of many years, and that at one time or another he had heard voices and had delusions but was free of both delusions and hallucinations when the doctor saw him. (Tr., 5, 9).

In October, 1970, defendant had been released from the Veteran's Hospital where he had been treated with tranquilizing drugs. He was supposed to continue the medication. Dr. Bliss said defendant told him he had taken the tranquilizers for a while after his release. However, he had stopped taking the medication and had been without sleep for three nights before the robbery. Dr. Bliss stated his opinion that at the time of the offense the defendant was not suffering from hallucinations or delusions, in reply to questions by the court.

The doctor testified, however, that there was no question but that defendant was very strongly driven "by this impulse, this overwhelming urge to get the money to buy explosives to detonate and so derive some sexual gratification." And he said apparently this urge was "strong enough to drive him to perform the act." Dr. Bliss did not believe the defendant had an irresistible impulse in the sense that he would have committed the act if policemen had been around, but he believed the defendant had a strong urge related to the explosives.

Two lay witnesses also testified. The bank teller said that defendant spoke in just a normal voice and did not appear particularly nervous or agitated at the time of the robbery. Defendant spoke about three phrases, repeated each twice, pausing between the phrases. (Tr., 30–31). The warehouse foreman where defendant worked testified that he had known defendant approximately two and a half years, and that defendant was an employee under his supervision. He stated that defendant was a little slow in some respects; that when he was asked to pull an item he would wander through the warehouse looking at each item; and that he couldn't remember exactly where they were placed. He said defendant was a good worker and that he had not noticed anything unusual about the way he acted. (Tr., 33–34).

The defense proof included documents concerning defendant's hospitalization in 1967 for an indeterminate period. An order for hospitalization showed that two physicians examined defendant in Sep-

tember, 1967, and gave a diagnosis of schizophrenic reaction, finding that defendant was mentally ill and in need of hospitalization for an indeterminate period. The doctor's report left a blank after the form question whether defendant's conduct was apparently dominated by delusions or hallucinations.

A hospital summary from the Veteran's Administration Hospital at Salt Lake and other medical records were also introduced. The summary stated that in 1942 defendant had joined the Service and went overseas to participate in the invasion of Guam. He related that at that time he liked the sound of explosives and claimed that when soldiers asked him why he froze up when they were fired on, he claimed he had a chill go down his back, a tingling sensation. The summary stated defendant set off explosives in Salt Lake City in 1955, for which he spent some time in jail and was then committed to the Utah State Hospital. He broke into a sporting goods store a few months later to steal guns and ammunition, and was rehospitalized for 7½ years. On discontinuation of medication after release in 1964, defendant again broke into a sporting goods store and was returned to the Utah State Hospital. In March, 1968, an examining physician at this hospital gave a diagnosis of defendant as a "chronic undifferentiated schizophrenic reactive with paranoid feature, ANA character disorder individual." The Veteran's Hospital summary reveals that defendant was hospitalized there from March, 1968, to October, 1970. At the time of discharge another psychiatrist at the Veteran's Hospital gave a diagnosis of antisocial personality and mental deficiency, primary, with a full scale IQ of 71.

Thus the proof raised a very serious question concerning the defendant's competency to commit the offense. It is the instructions, questioning and comments of the trial court dealing with this issue

which the defendant challenges on this appeal.

First, defendant says that the court's questions and comments during trial and its instructions on the competency issue did not comply with the standard promulgated by this court, relying primarily on Wion v. United States, 325 F.2d 420 (10th Cir.) (en banc), cert. denied, 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309. More specifically defendant argues that the court erred by failing to inform the jury that one is deemed mentally incompetent if he lacks substantial capacity to control his conduct and that there is no requirement that mental impairment be total. And defendant says the court erred by informing the jury that it could find defendant incompetent if his acts were the result of a delusion, whereas the proper test imposes no requirement that incapacity result from a delusion or any other particular type of mental impairment.

There was considerable discussion of delusions during the trial and in the instructions. The prosecution's expert, Dr. Bliss defined the term delusion "as a mistaken idea, concept, which has little or no basis with reality."[3] He gave examples such as believing one is God or Napoleon or the feeling that one is being followed. However, the witness did not classify the defendant's mental condition with regard to setting off explosives to obtain sexual gratification as a delusion. Instead he testified that defendant was not under the influence of a delusion at the time of the offense, at least by all the information the defendant gave him, although there was no question but that the defendant was strongly driven by an overwhelming urge to get money to buy explosives to detonate to derive some sexual gratification (Tr., 8). And, as stated, defendant's medical exhibits did not indicate that his conduct was apparently dominated by delusions or hallucinations.

3. This definition by the prosecution witness follows the standard definition of delusion as a false belief. Dorland's Illustrated Medical Dictionary (24th ed.), 395; Taber's Cyclo-pedic Medical Dictionary (12th ed.), D–12. The latter dictionary defines the term as: "A false belief, as the individual's believing he is Napoleon."

In the court's questioning and comments during trial the emphasis repeatedly was on whether the defendant had a delusion, while the prosecution and defense proof showed not a delusion but a serious mental disease or defect of a different sort as evidenced by the strong drive from which defendant admittedly suffered.

The prosecution's expert witness distinguished the defendant's mental condition from a delusion, while the trial court appeared to focus on delusions:

THE COURT: Well, do you think he was—assuming that he had the mental competence to know and understand what he was about, do you think he was so influenced by an insane delusion that he didn't have any control over his conduct?

THE WITNESS: So far as I know, he was not under the influence of a delusion at the time, at least by all the information he gave me. There is no question in my mind that he was very strongly driven by this impulse, this overwhelming urge, to get the money to buy explosives to detonate and so derive some sexual gratification. I couldn't estimate, really, quantify, the intensity of this. Apparently it was strong enough to drive him to perform the act. Would he have performed this if there had been policemen at his side? I really can't answer that question. I am not sure. My guess is: Probably not. (Tr., 8–9)

The trial court instructed the jury in part along lines similar to those of the *Wion* standard, saying that they must ask themselves whether defendant had the brain power to entertain the criminal intent, and that having the brain power, was he nevertheless under a driving force so compelling that he was deprived of his free will and choice, if what he was doing was the product of those forces in him rather than his voluntary choice (Tr., 51–52). However, the charge focused repeatedly on whether the defendant was driven by an insane delusion. Shortly after posing the questions re-ferred to above, the court told the jury there was another thing to consider:

Was his conduct at that time and place and under the circumstances there in the bank his free voluntary choice, exercise of his own free choice and will? Was he willing the result or was he driven by some insane delusion to do what he did? (Tr., 52)

We are convinced that the defendant was prejudiced by the way the issue was submitted to the jury, viewing the record as a whole. In Wion v. United States, supra, 325 F.2d at 430, this court made clear its adoption of the A.L.I. standard on criminal responsibility and discussed the instructions which should be given on this issue:

When as here, therefore, the mental capacity of the accused to commit the offense charged is put in issue, the jury is to be told in substance that it is an essential element of the crime charged; that before convicting the accused, the jury must be satisfied beyond a reasonable doubt not only that the accused committed the unlawful act, but that he was criminally responsible for his conduct; and, that a person is not criminally responsible for his conduct if, at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The jury is then to be told that, as applied to their case, the test for criminal responsibility means that before they may return a verdict of guilty, they must be convinced beyond a reasonable doubt that at the time the accused committed the unlawful act, he was mentally capable of knowing what he was doing, was mentally capable of knowing that it was wrong, and was mentally capable of controlling his conduct.

*Wion* uses the general terms "mental disease or defect" to permit the scientists "full freedom to put their professional findings and conclusions before the court and jury." *Wion,* supra at 430. It re-

jects any requirement .of coming within particular labels or classifications of mental disease or defect. See United States v. Freeman, 357 F.2d 606, 620–623 (2d Cir.); Model Penal Code § 4.01, Comment 3. Where such labels are used it is important that they be treated with great care so that they do not seem to limit the full disclosure of the defendant's· mental condition. Cf. United States v. Chandler, 393 F.2d 920, 926, n. 17 (4th Cir.).

As stated earlier, in some portions of the instructions the trial court did phrase the issue along the lines of the *Wion* test, and of course we must look at the ·charge as a whole. However, there were repeated references in the instructions and in the court's comments during the trial focusing heavily on whether the defendant had a "delusion." In referring to the testimony of Dr. Bliss about defendant's condition the court stated that the doctor says "that is a kind of a delusion." (Tr., 51). The difficulty is that the doctor actually distinguished the defendant's drives from a delusion, and defendant's medical proof showed no "delusion." The doctor testified he did not believe defendant was suffering from delusions at the time of the crime—and defined and illustrated a delusion as a disorder clearly different from the defendant's drives. We are convinced the jury may well have been misled and confused by the trial court's focusing attention on "delusions," to the serious prejudice of the defendant. See Bollenbach v. United States, 326 U.S. 607, 612–613, 66 S.Ct. 402, 90 L.Ed. 350; Government of Virgin Islands v. Carmona, 422 F.2d 95, 99 (3d Cir.).

Moreover there was no explanation in the instructions that the question was whether defendant lacked *"substantial capacity"* to appreciate the wrongful-ness of his conduct, or to conform his conduct to the requirements of the law. Instead the court in its questioning asked whether defendant was so influenced by an insane delusion that he "didn't have *any* control over his conduct" (Tr., 8) (emphasis added). Defendant points out also that the prosecution's expert witness said he doubted very much that defendant would rob a bank if there had been a policeman at his elbow at the time, adding however that there was a strong urge.[4] On this record it was thus especially important that the jury be told, in accordance with *Wion*, that the question was one of "substantial capacity" of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. This is an important feature of the A.L.I. test, as adopted in *Wion*, supra, 325 F.2d at 430; see United States v. Frazier, 458 F.2d 911, 917 (8th Cir.); Blake v. United States, 407 F.2d 908, 915 (5th Cir.); United States v. Shapiro, 383 F.2d 680, 685, (7th Cir.) and it should have been clearly explained to the jury.

We are convinced that the cumulative effect of the instructions, questions and comments by the trial court prejudiced the defendant here in submission of the sole issue of competency which the jury decided, so as to constitute reversible error. See Marcus v. United States, 422 F.2d 752, 753 (5th Cir.); Getchell v. United States, 282 F.2d 681, 691 (5th Cir.).

The Government argues that the defendant did not object to the instructions or the doctor's remark on cross-examination about the legal criterion concerning a policeman at your elbow. See n. 4, supra. Therefore it says such errors may not be considered in view of Rule 30, F.R.Crim.P., and the requirement for making such objections at trial before

---

4. Defendant argues that the expert incorrectly stated the legal standard of competence in his testimony (Tr., 18):

> A I can't really—I don't know what an "irresistible urge" is, honestly. All I know is that some urges are stronger than others, and some seem to be very, very forceful in-

deed. I think he had a strong urge, but the legal criterion of having a policeman at your elbow—I don't think it was that strong. That there was a strong urge I would not deny. It apparently was sufficiently strong to keep him awake three nights.

appellate contentions on such points may be urged. Under these principles this court does generally decline to consider contentions not made at trial, except in a case of plain error affecting substantial rights of the defendant. See Rule 52(b), F.R.Crim.P.; Lowther v. United States, 455 F.2d 657, 665 (10th Cir.), cert. denied, 409 U.S. 857, 887, 93 S.Ct. 114, 139, 34 L.Ed.2d 102.

In determining whether there was plain error we must view the record from all four corners. Wright v. United States, 301 F.2d 412, 414 (10th Cir.). The issue of competency to commit the offense was clearly raised by strong evidence. Since the presumption of sanity was dissipated, the mental capacity of the accused to commit the offense became an essential element of the offense to be proved by the prosecution by competent evidence beyond a reasonable doubt. See United States v. Bettenhausen, 499 F.2d 1223, 1228 (10th Cir.). Competency was the only issue tried. By focusing the jury's attention on whether the defendant suffered from a delusion, and by not submitting the question as whether the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, the *Wion* standard was not applied. We feel we must notice such prejudice to the defendant's substantial rights. United States v. Owens, 460 F.2d 268, 269 (10th Cir.); Wright v. United States, supra, 301 F.2d at 414. "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350.

In addition the Government contends that in any event the trial court's instructions on the issue of mental competence substantially complied with the standard prescribed by this court, relying on Coffman v. United States, 290 F.2d 212 (10th Cir.), and *Wion*. For reasons stated earlier we are convinced that on this record as a whole the substance of the charge required by *Wion* was not made clear to the jury and that the de-

fendant was prejudiced by the manner of submission of the issue.

Accordingly the judgment must be reversed and the case remanded for a new trial.