**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jesse Eugene TECUMSEH, Defendant–Appellant.**

No. 80–1278.

United States Court of Appeals, Tenth Circuit.

Submitted June 16, 1980.

Decided Aug. 29, 1980.

Certiorari Denied Nov. 3, 1980.
See 101 S.Ct. 376.

**750**

Hubert H. Bryant, U.S. Atty., and Kenneth P. Snoke, Asst. U.S. Atty., Tulsa, Okl., for plaintiff–appellee.

Larry A. Gullekson and Stanley D. Monroe of Frasier, Frasier & Gullekson, Tulsa, Okl., for defendant–appellant.

Before SETH, Chief Judge, PICKETT and HOLLOWAY, Circuit Judges.

PICKETT, Circuit Judge.

After examining the briefs and the appellate record, this three–judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R. App.P: 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Appellant Tecumseh was convicted of first degree murder for the killing of his wife and sentenced to life imprisonment. The principal contentions on appeal are that the court erred in admitting in evidence an alleged in–custody confession made to police officers shortly after appellant's arrest, and in its instruction to the jury relating to an inference of malice to be drawn from the use of a dangerous weapon.

The facts are not in dispute. For a number of years the married life of Jesse Tecumseh and his wife Wilma was very difficult, due primarily to the excessive drinking of Jesse. On or about July 15, 1979, Jesse and his wife, together with his daughter, son–in–law and two grandchildren, were in their home near Claremore, Oklahoma. Jesse had been drinking and a rather violent quarrel occurred. During this episode Jesse stated, "I'm a murdering son–of–a–bitch and I can go get a gun and come back and kill all of you and get away with it because Tommy Frasier [an attorney] will get me off." Immediately after this occurrence Wilma left their home and moved into an apartment in Claremore. She instituted divorce proceedings and summons was served on Jesse July 18, 1979. During the morning of July 27, 1979, Jesse was in a Claremore bar and drank some beer. He told a barmaid that he was having trouble with his wife. Before he left he telephoned Wilma. He then went to a hardware store, purchased a boning knife, and proceeded directly to Claremore Indian Hospital, where Wilma was employed as a nurse. He made inquiry as to her whereabouts in the hospital and was directed to the room in

which she was engaged in the performance of her duties. After Jesse's entry into the room muffled screams were heard and he was seen leaving the room with blood on his right hand. Wilma was found in a dying condition resulting from stab wounds caused by a knife.

Claremore police were notified. Jesse was arrested and taken to police headquarters, where he was interviewed by the chief of police and a police detective. Jesse was carefully informed as to his rights prior to the interview. He signed the conventional waiver of rights, after which he admitted that he had stabbed his wife at the hospital. The adequacy of the warnings given by the police to Jesse and his waiver of rights is not questioned, but it is argued that during the questioning Jesse indicated he desired to talk to an attorney, and that some questioning continued thereafter without the presence of an attorney. A review of the record does not support this contention.

At the trial objection was made to the introduction of the incriminating statements and the court granted a request for a hearing, as suggested in *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964), to determine if any constitutional rights of the accused had been violated. At the hearing only the chief of police and the police detective testified. The chief of police stated that near the end of the interview Jesse suggested he would like to talk to attorney Van Zandt. The chief was unable to locate Van Zandt. No incriminating statements were made during the interview which followed. As to what point in the interview Jesse requested an opportunity to talk to Van Zandt, the chief testified:

Q. All right. Where was the statement about Van Zandt, where was that in relationship to the statement he made about—he made ultimately at some point, he made a statement about killing his wife, did he not?

A. Yes.

Q. When was that statement made relative to the time that you tried to reach Bob Van Zandt?

A. This was well after the interview had started, after he made the statement of stabbing his wife, this was at the close of the interview.

Q. Close to what?

A. At the closing of the interview.

Q. Which was?

A. When he mentioned about calling Van Zandt.

Q. All right. So, you mean before he actually called Van Zandt, he had already made the statement—

A. Yes.

Q. —about killing his wife?

A. Yes.[1]

■ The court found that the confession was given voluntarily and that no constitutional rights of the accused had been violated. While admitting that the original warnings given to Jesse and his waiver of constitutional rights were adequate, counsel argues that continued questioning of the prisoner after his request to consult an attorney destroyed the admissibility of the confession as evidence. The law is settled that when an individual in the custody of officers is being questioned as to a crime, and

indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . .

*Miranda v. Arizona*, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). This rule was observed, as no incriminating statements were made after the suggestion that Tecumseh desired to consult an attorney.

---

1. Tecumseh did not testify at the hearing or at the trial. The defense attempted to develop on cross-examination of various witnesses that

Tecumseh was drunk at the time of the stabbing of his wife.

■ Furthermore, the record discloses no evidence that Tecumseh desired to consult an attorney before further questioning. The evidence is to the contrary. Approximately two hours after the police interrogation Tecumseh was interviewed by agents of the Federal Bureau of Investigation. Before answering any of the agents' questions he voluntarily executed another waiver substantially the same as the one obtained by the police. He was fully advised of his right to consult an attorney. No request was made for such service. Considering all the facts, there was no error in admitting into evidence the statements of Tecumseh. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *United States v. Palmer*, 604 F.2d 64 (10th Cir. 1979); *United States v. Carra*, 604 F.2d 1271 (10th Cir. 1979), cert. denied, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

■ It is next urged that the court erred in admitting in evidence Tecumseh's statement that he was "a murdering son–of–a–bitch and I can go get a gun and come back and kill all of you and get away with it because Tommy Frasier will get me off." The record is not clear as to the basis for the objection, but it is argued that the statement was a needless accumulation of evidence to the prejudice of the accused prohibited by Rule 403 of the Federal Rules of Evidence, or was proof of a crime other than the one charged and therefore in conflict with Rule 404(b) of the Federal Rules of Evidence. There is no merit to this argument. In overruling the objection, the court stated:

It appears to the Court that since one of the essential elements of the crime is premeditation and malice aforethought that it is an element that goes to the state of mind that this defendant may very well have had and that it is probative and it is relevant and, therefore, the Court will overrule the objection.

The evidence was not proof of an offense other than that for which the accused was being tried. It had probative value and was admissible within the discretion of the trial court. There was no abuse of that discretion. In *United States v. Nolan*, 551 F.2d 266, 270 (10th Cir.), cert. denied, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977), this court said:

We have repeatedly held that evidence of uncharged crimes, wrongs or alleged prejudicial acts may be received for purposes proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *United States v. Freeman*, 514 F.2d 1184 (10th Cir. 1975); *United States v. Parker*, 469 F.2d 884 (10th Cir. 1972); *United States v. Pickens*, 465 F.2d 884 (10th Cir. 1972); *United States v. Pauldino*, 443 F.2d 1108 (10th Cir. 1971), cert. denied, 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163 (1971); *United States v. Eagleston*, 417 F.2d 11 (10th Cir. 1969). . . .

Section 1111, Title 18 of the United States Code, the murder statute under which Tecumseh was indicted, states that "[m]urder is the unlawful killing of a human being with malice aforethought." In its instructions to the jury, the court gave a comprehensive instruction upon the necessity of proof of malice beyond a reasonable doubt to sustain a conviction of murder. The court pointed out that malice is a state of mind and can be established only from inferences drawn from surrounding facts and circumstances in the killing of a human being. It was stated that the murder charge could be sustained only if the jury were convinced beyond a reasonable doubt from the evidence that the murder had been committed by the accused. The court concluded its reference to the proof of malice with this statement:

Now, if it is shown by the proof and you find it is a fact that the defendant used a deadly weapon in the commission of a homicide, then you may find, from the use of such weapon, in the absence of explanatory or mitigating circumstances, the existence of the malice which is an essential element of the offense. You are not obligated so to find, however. You may not find the defendant guilty unless

you are satisfied that the government has established every essential element of the offense as explained in these instructions beyond a reasonable doubt.

It is urged that this instruction permitted an inference or assumption of an essential element of the crime charged and unconstitutionally shifted to the defendant a burden of refuting the inference of malice. It should be noted that the instruction used the word, "may," and stated specifically to the jury that "you are not obligated to so find" that malice existed.

The legality of inferences and assumption of facts has long been considered by the courts in criminal cases. For example, the United States Supreme Court and this court have approved instructions in criminal cases in which the jury was told that possession of recently stolen property could create an inference that the person in possession knew it was stolen. *Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Brown,* 541 F.2d 858 (10th Cir.), cert. denied, 429 U.S. 1026, 97 S.Ct. 650, 50 L.Ed.2d 630 (1976); *United States v. Matthews,* 427 F.2d 889 (10th Cir. 1970).

The Supreme Court of the United States has written extensively on the subject. Although there is a contrariety of views among the Justices as to its application in various factual situations, there appears to be a consensus that if the inference instruction is not mandatory and permissive only, there is no violation of due process rights. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Decisions relating to the question have been reviewed by the Supreme Court in more recent cases. In *Ulster County Court v. Allen,* 442 U.S. 140, 156–157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979), it was held that a court's instruction on a statutory presumption met constitutional standards. The Court stated:

Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime–that is, an "ultimate" or "elemental" fact–from the existence of one or more "evidentiary" or "basic" facts. *E. g., Barnes v. United States,* 412 U.S. 837, 843–844 [93 S.Ct. 2357, 2361–2362, 37 L.Ed.2d 380]; *Tot v. United States,* 319 U.S. 463, 467 [63 S.Ct. 1241, 1244, 87 L.Ed. 1519]; *Mobile, J. & K. C. R. Co. v. Turnipseed,* 219 U.S. 35, 42 [31 S.Ct. 136, 137, 55 L.Ed. 78]. The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. See *In re Winship,* 397 U.S. 358, 364 [90 S.Ct. 1068, 1072, 25 L.Ed.2d 368]; *Mullaney v. Wilbur,* 421 U.S. [684], at 702–703, n. 31 [95 S.Ct. 1881, 1891–1892 n. 31, 44 L.Ed.2d 508].

The most common evidentiary device is the entirely permissive inference or presumption, which allows–but does not require–the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant. See, e. g., *Barnes v. United States, supra,* [412 U.S.] at 840 n. 3 [93 S.Ct. at 2360 n. 3]. In that situation the basic fact may constitute prima facie evidence of the elemental fact. See, e. g., *Turner v. United States,* 396 U.S. 398, 402 n. 2 [90 S.Ct. 642, 645 n. 2, 24 L.Ed.2d 610]. When reviewing this type of device, the Court has required the party challenging it to demonstrate its invalidity as applied to him. *E. g., Barnes v. United States, supra,* [412 U.S.] at 845 [93 S.Ct. at 2362]; *Turner v. United States, supra,* [396 U.S.] at 419–424 [90 S.Ct. at 653–656]. See also *United States v. Gainey,* 380 U.S. 63, 67–68, 69–70 [85 S.Ct. 754, 757–758, 758–759, 13 L.Ed.2d 658]. Because this permissive

presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.

In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a unanimous court held that an instruction in a homicide case, which stated that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," could be construed by a jury as requiring the accused to rebut the presumption, and was therefore a violation of the due process clause of the Constitution, citing *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). From the decisions it is clear that the burden of proving all the essential elements of a crime is upon the prosecution and that the burden cannot be shifted to the accused by inference. We are satisfied that the entire instruction given in this case makes plain that the burden of proving every essential element of the crime charged, including malice beyond a reasonable doubt, was upon the prosecution, and in no way shifted to the defense.[2] The jury was left free to assess the evidence and to determine the ultimate fact of guilt beyond a reasonable doubt independent of the inference.

Finally it is contended that the court erred in admitting into evidence a boning knife, articles of clothing worn by Tecumseh on the day his wife was killed, and some photographs of Tecumseh taken after his arrest showing blood stains. This contention needs no discussion. The record shows that the exhibits were relevant and had a rational connection with the issues presented. *United States v. Marx*, 485 F.2d 1179 (10th Cir. 1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974).

AFFIRMED.

---

2. The questioned portion of the malice instruction was taken from Devitt & Blackmar, *Federal Jury Practice and Instructions*, § 41.18 (Third Edition 1977). The instruction was approved by the Fifth Circuit in *United States v. McRae*, 593 F.2d 700 (1979), cert. denied 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979). See also *McInerney v. Berman*, 621 F.2d 20 (1st Cir. 1980); cf. *Baker v. Muncy*, 619 F.2d 327 (4th Cir. 1980).