Edward Dennis JACKS, Jr.,
Petitioner-Appellant,

v.

Jack R. DUCKWORTH, Warden,
Respondent-Appellee.

No. 80–1639.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1980.

Decided June 10, 1981.

Rehearing and Rehearing En Banc
Denied August 14, 1981.

Julius Echeles, Chicago, Ill., for petitioner-appellant.

David L. Steiner, Deputy Atty. Gen. of Ind., Indianapolis, Ind., for respondent-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and BROWN, Senior District Judge.*

CUMMINGS, Circuit Judge.

■ Petitioner Edward Dennis Jacks, Jr. appeals from a denial of his habeas corpus petition under 28 U.S.C. § 2254. Petitioner was indicted by an Indiana grand jury in September 1975 for the first-degree murder of his wife, Kathleen B. Jacks, on August 28, 1975. The case was tried to a jury in Indiana state court in November 1976. At trial, petitioner contended that he was not criminally responsible by reason of insanity at the time of the homicide. The jury found petitioner guilty as charged, and he was sentenced to life imprisonment. The Indiana Supreme Court affirmed the conviction on direct appeal. *Jacks v. State,* Ind., 394 N.E.2d 166 (1979). Petitioner then filed the present habeas corpus petition, raising essentially the same issues decided adversely to him in the direct appeal. The district court agreed with the conclusions of the Indiana Supreme Court and dismissed the petition. Our review in a habeas corpus proceeding is limited to constitutional errors that deprive a defendant of fundamental fairness guaranteed by the Fourteenth Amendment. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642–643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, see *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067. Finding no such error in petitioner's trial, we affirm.

I

Petitioner's first asserted ground for relief concerns a portion of a tape-recorded conversation between himself and Detective Sergeant Miller which took place at the police station after petitioner's arrest on August 28, 1975. At the outset of the conversation, Sergeant Miller gave petitioner his *Miranda* warnings. Petitioner did not then invoke either his right to remain silent or his right to have an attorney present, but

continued to converse with Sergeant Miller and to answer preliminary questions about his name, age, and occupation. Thereafter the following colloquy took place:

> Mr. Miller: Do you know what happened? Tonight?
>
> [Petitioner]: I'm not exactly sure what happened.
>
> Mr. Miller: You're not exactly sure. Have you been drinking?
>
> [Petitioner]: As regards what happened this evening, I want to talk to my attorney.
>
> Mr. Miller: Okay.

Thereafter petitioner continued to engage in an extended conversation with Sergeant Miller. The trial court admitted into evidence that portion of the conversation, offered for supposed admissions and denials therein, ending with the above-quoted colloquy and excluded everything thereafter.

Petitioner claims that his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel, as incorporated in the Fourteenth Amendment, were violated when the jury was permitted to hear over his objection the single statement to Sergeant Miller that "As regards what happened this evening, I want to talk to my attorney." The prior conversation with Miller is not challenged. (It is reproduced in Appendix A hereto.) To support this argument, petitioner relies principally on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, in which the Supreme Court held, "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245. Petitioner also relies on *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99, in which the prosecutor was not permitted "during the trial to call attention to * * * [petitioner's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as

---

* The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation.

he was told he need not do so, an unfavorable inference might be drawn as to the truth of his trial testimony * * *." 422 U.S. at 182–183, 95 S.Ct. at 2139.

■ However, neither *Doyle* nor *Hale* is applicable here because this case does not involve an attempt by the prosecutor to use petitioner's silence or failure to testify against him or for impeachment purposes. In fact, petitioner did not remain silent at the time of arrest. Rather, he spoke voluntarily and freely with Sergeant Miller after having received his *Miranda* warnings and even after having uttered the 13 words now in issue, thereby indicating that he was not then invoking his right to remain silent.[1] Out of an abundance of caution and in foreordained harmony with *Edwards v. Arizona,* —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 decided by the Supreme Court on May 18, 1981, the trial judge granted petitioner's motion to suppress the portion of the tape immediately following the challenged sentence (R. 554–555). (The suppressed statement is reproduced in Appendix B hereto.) But it is only at the very end of the tape, some three pages of transcript after that sentence, that petitioner stated he "desired to have an attorney before talking [further] to the police" (R. 352) and stopped talking. Petitioner himself explained to Sergeant Miller after the challenged sentence that he did not want to call an attorney (R. 351), and Richard H. Sproull, then co-counsel for petitioner, subsequently admitted to the judge that at the time in question petitioner did not want a lawyer (R. 558). Petitioner also testified freely at his trial. Certainly the reading of this one sentence to the jurors after they had been read the considerable forepart of

petitioner's conversation with Officer Miller would be lost in all the rest of the evidence rather than cause them to convict. The trial judge left it in merely to mark the termination of the permissible evidence and that which became impermissible, he thought, after defendant first sought counsel. While it might have been better practice to suppress the sentence, certainly it was not so prejudicial a ruling as to constitute reversible error in view of the strong case against petitioner.

■ Consequently, it is obvious that appellate counsel for petitioner is now presenting a self-serving, unwarranted interpretation of a single sentence whose admission in nowise was a violation of petitioner's constitutional rights in that petitioner was not at that point invoking either his right to remain silent or his right to have counsel present. Indeed his right to counsel under the Sixth and Fourteenth Amendments had not attached because no adversary judicial proceedings had been initiated. *Moore v. Illinois,* 434 U.S. 220, 226–227, 98 S.Ct. 458, 463–464, 54 L.Ed.2d 424. The district court therefore correctly held that reversible error was not committed when this sentence was permitted into evidence without any misuse by the prosecutor.

## II

■ Petitioner next claims that the trial court committed reversible error by allowing the jury to hear a tape recording of a telephone conversation between petitioner and his mother that also took place on the night of his arrest. The conversation was

---

1. Other cases on which petitioner relies are similarly distinguishable in that they involved situations in which the defendant exercised his constitutional rights and remained silent. For example, in *United States v. Matos,* 444 F.2d 1071 (7th Cir. 1971), the defendant did not make any pretrial statement after indicating that he did not wish to do so and a postal inspector told the jury that defendant had refused to make a pretrial statement. See also *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968); *Baker v. United States,* 357 F.2d 11 (5th Cir. 1966). We also note that in his *Matos*

dissent then Judge Stevens concluded that because of the strong evidence of defendant's guilt, the postal inspector's comment was harmless error. 444 F.2d at 1077. The same would be true here if indeed there were error at all.

   In *Edwards v. Arizona, infra,* the state courts admitted in evidence statements implicating defendant in the crime after he had requested the presence of counsel. Here the trial judge suppressed all statements of Jacks after he first requested counsel.

recorded without a court order and therefore, as the State concedes, could not be used by the State as part of its case in chief. However, the State maintains that the tape was admissible in its rebuttal under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. In *Harris*, the Supreme Court held that otherwise impermissible evidence could be used by the prosecution on rebuttal, stating that no exclusionary rule may permit affirmative perjury and that "sufficient deterrence [to proscribed police conduct] flows when the evidence in question is made unavailable to the prosecution in its case in chief." 401 U.S. at 225, 91 S.Ct. at 645. While *Harris* and its progeny[2] involved evidence obtained in violation of the Fourth Amendment, the rationale has been extended, and properly so, to cases involving evidence obtained as here in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510–2520). See *United States v. Caron*, 474 F.2d 506, 509–510 (5th Cir. 1973).

In sustaining the admissibility of the tape and denying petitioner's motion for a mistrial, the trial judge noted that it dealt with petitioner's and his mother's testimony on direct examination. He admonished the jury that the contents of the tape should be considered only to determine the credibility

of petitioner and his mother and on the issue of petitioner's sanity,[3] but not as to whether petitioner had committed the crime charged. In so doing, the judge could properly have relied on *United States v. Stewart*, 443 F.2d 1129 (10th Cir. 1971).[4] In that case, as here, the sole defense was insanity. In its rebuttal, the Government was permitted to introduce a tape of an undercover police agent's two conversations with the defendant even though the conversations were illegally recorded. The jury was instructed that the evidence was to be considered on the issue of the defendant's competence on the date of the alleged narcotics transactions and on the question of defendant's specific intent. On appeal, the Tenth Circuit upheld the use of the tape, stating that the conversations were "of probative effect and of particular relevance to the question of Stewart's mental capacity." 443 F.2d at 1135. Likewise, in this case, petitioner's conversation with his mother is "of probative effect" with respect to petitioner's mental condition and with respect to the trial testimony of petitioner and his mother as to his sanity. Therefore, the trial court's ruling is supported by *Stewart* and was not erroneous. In addition, there was no objection to the court's letting the jury consider it as to petitioner's sanity.

2. *E. g., United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559; *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570, see also, *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503; *United States v. Farese*, 611 F.2d 67 (5th Cir. 1980); *United States v. Tweed*, 503 F.2d 1127 (7th Cir. 1974).

3. The State interprets the court's instructions to the jury as permitting the jurors to consider the tape with respect to the credibility of petitioner and his mother as to their testimony on his mental condition and not independently on the issue of his sanity. This interpretation harmonizes with a previous instruction given the jury with respect to petitioner's mother's earlier testimony about her telephone conversation with petitioner (R. 658). Nevertheless, the court's earlier reliance on *United States v. Stewart*, 443 F.2d 1129 (10th Cir. 1971), as discussed in the text, persuades us that the instruction was not as narrow as the State would like.

4. The trial judge inadvertently referred to the *Stewart* case as *United States ex rel. Henderson v. Mazurkiewicz*, 3 Cir., 443 F.2d 1135 (R. 360) apparently because that was the heading in F.2d above the language he relied upon in the *Stewart* opinion.

The judge had cited *Stewart* in a colloquy with counsel as to the admissibility of the first portion of the taped conversation between Sergeant Miller and petitioner (R. 360). However, that tape was offered by the Government in its case in chief to show admissions of petitioner and not as to his sanity defense (R. 358). The judge *sua sponte* instructed the jury to consider the intercepted telephone conversation between petitioner and his mother as to petitioner's sanity as well as to their credibility (compare R. 658 with R. 848). In so doing he may well have had in mind his earlier reliance on *Stewart* to which he had called counsel's attention.

Even assuming, however, that there was error, we would be compelled to affirm on the basis of *Hussong v. Warden, Wisconsin State Reformatory*, 623 F.2d 1185 (7th Cir. 1980). In *Hussong*, incriminating evidence obtained in violation of Title III was used against defendant in the prosecution's case in chief at defendant's trial for murder. We held that such a non-constitutional violation was not cognizable in a habeas corpus proceeding under 28 U.S.C. § 2254 where as here the defendant had received a sufficient hearing in state court on his suppression claims, so that his custody was not inconsistent with the rudimentary demands of fair procedure and did not constitute a complete miscarriage of justice. Here as there, to paraphrase Judge Swygert's language in *Hussong*, "we have no reason to believe that [petitioner] was not convicted on the basis of probative and reliable evidence, even if that evidence was wrongfully admitted. In short there is nothing in the record to indicate that [petitioner] is not guilty of the crime for which he was convicted." 623 F.2d at 1191. Accordingly, we reject petitioner's assertion that the receipt into evidence of the conversation between him and his mother justifies collateral relief from his conviction.

### III

Petitioner also complains of three instructions to the jury that are reproduced in Appendix C hereto.

Under Indiana law, petitioner waived the right to object to Court's Instruction No. 13 because of his failure to make a timely objection. See *Bell v. State*, 267 Ind. 1, 366 N.E.2d 1156, 1160 (1977). Since petitioner has not shown cause for his failure to make a timely objection and actual prejudice by the use of Instruction No. 13, habeas corpus relief is improper. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594; *Blenski v. LaFollette*, 581 F.2d 126, 129–130 (7th Cir. 1978). Furthermore, any defect in Instruction No. 13 was cured by Court's Instruction No. 5, *infra*, pp. 486–487.

Petitioner did object to the giving of the State's Instructions Nos. 4 and 5 and contends that those instructions diluted the State's burden of proof on intent by permitting the jury to presume intent against him.

As to State's Instruction No. 4, there was no error. It was derived from language in *Hill v. State*, 252 Ind. 601, 251 N.E.2d 429, 435–436 (1969), and does not have the claimed effect of allowing the jury to presume the intent requirement of the offense against petitioner. Nor was it, as petitioner claims, fatally "prejudicial in the context of jury instructions concerning social responsibility and philosophy" (Br. 38). Furthermore, as noted by the Supreme Court of Indiana (394 N.E.2d at 174), the defense of insanity alluded to in that instruction of course had to be read with Court Instruction No. 22 concerning the sanity issue (R. 240). Petitioner does not attack comprehensive Instruction No. 22. Since jury instructions must be viewed as a whole (*Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368), there was no reversible error in giving Instruction No. 4.

Similarly, in contrast to the instruction condemned three years after this trial in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, on which petitioner relies, Instruction No. 5 does not contain a mandatory injunction to presume the requisite intent from the act committed since the jurors were told they could "look to all the surrounding circumstances, including what was said and done in relation thereto" and that any presumption of "a criminal intent from an unlawful act knowingly done" was rebuttable by "justifying or excusing facts." The absence of a mandatory effect in State's Instruction No. 5 is also shown by the qualifying phrase "unless the circumstances are such as to indicate the absence of * * * intent" which follows the reference to the presumption condemned in *Sandstrom* that everyone intends the natural and probable consequences of his voluntary acts.[5] Since the qualifying phrases

---

5. In *McGuinn v. Crist*, 492 F.Supp. 478, 481 (D.Mont.1980), which petitioner cites to us, the

instruction was word for word the one condemned in *Sandstrom, supra*, so that the case

nullified the mandatory flavor of the language condemned in *Sandstrom*, Instruction No. 5 did not dilute the State's burden of proof and the district court correctly held that there was no error committed in giving this instruction. Judge Sharp properly rested his conclusion on the following language from the Indiana Supreme Court herein:

"Further, however, it would appear the instruction given in this case does not have either the conclusive or burden-shifting effect the Court found repugnant in the *Sandstrom* case. 'Sandstrom's jurors were told that the law presumes that a person intends the ordinary consequences of his voluntary acts.' They were not told they had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory. 442 U.S. at 513, 99 S.Ct. at 2454. In the present case the trial court did make the statement found in *Sandstrom*. However, the court qualified it by stating that the jurors were to look to all of the surrounding circumstances, including what was said and done in relation to the acts, and that everyone is presumed to intend the natural consequences of his voluntary acts *unless* the circumstances are such as to indicate the absence of such intent. The second paragraph of State's instruction number five says that '[w]hen an unlawful act, however, is proved to be knowingly done, no further proof is needed on the part of the State *in the absence of justifying or excusing facts....* Record at 274 (emphasis added). Therefore, we do not feel that this instruction was as limited and mandatory in effect as the United States Supreme Court found the instruction in *Sandstrom* to be. We find no error as to this issue." 394 N.E.2d at 175.

As in *United States v. Tecumseh*, 630 F.2d 749, 754 (10th Cir. 1980), certiorari denied, 449 U.S. 961, 101 S.Ct. 376, 66 L.Ed.2d 229, if the entire instructions given in a case make plain that "the burden of proving every essential element of the crime charged * * * was upon the prosecution," there is no violation of the Due Process Clause. See also *United States ex. rel. Goddard v. Vaughn*, 614 F.2d 929, 935 (3d Cir. 1980). Here too the instructions as a whole make it plain that the jury was not compelled to presume intent. Thus the trial court read 34 instructions to the jury. In reading the indictment in Court Instruction No. 1 as to first degree murder, of which Jacks was ultimately convicted, the court noted that the grand jury indicted petitioner for "unlawfully, feloniously, *purposely* and maliciously, and with premeditated malice" murdering his wife. He told the jurors in his Instruction No. 2 that the burden was upon the State "to prove all of the material allegations of the indictment, beyond a reasonable doubt."

In his Instruction No. 3, he read the Indiana statute defining murder in the first degree as applying to "Whoever purposely and with premeditated malice ... kills any human being." Then the court read its Instruction No. 4 that "a Defendant is presumed to be innocent until the contrary is proved. When there is a reasonable doubt whether his guilt is satisfactorily shown, he must be acquitted."

In the Court's Instruction No. 5, jurors were told that in order to find petitioner guilty of murder in the first degree, the State must establish by proof "beyond a reasonable doubt that the crime charged against the Defendant was committed by him purposely and with premeditated mal-

was controlled thereby. Moreover, in *McGuinn* the prejudicial effect of its *Sandstrom* instruction was aggravated by another immediately following instruction. Therefore, *McGuinn* does not support petitioner.

As with the Third and Fifth Circuits, we agree that this type of instruction should not be given in future cases. *United States v. Garrett*, 574 F.2d 778 (3d Cir. 1978); *United States v. Chiantese*, 560 F.2d 1244 (5th Cir. 1977).

In *United States v. Spiegel*, 604 F.2d 961, 969 (5th Cir. 1979), the court stated that *Sandstrom* should not be given retroactive effect.

ice" and that "purposely" means intentionally and designedly. The Court's Instruction No. 12 advised the jury that the use of a deadly weapon does not necessarily imply the requisite malice "unless such deadly weapon was intentionally used in such a manner as was calculated to or was likely to cause death * * *."

Again, in Court's Instruction No. 14, the jury was advised that the jurors must "endeavor to reconcile all the evidence in the light of the presumption of innocence, if it is possible so to do," and that the presumption of innocence alone "is sufficient to acquit a Defendant, unless you are satisfied beyond a reasonable doubt of the Defendant's guilt from all the evidence in the case."

In Court's Instruction No. 15, the jurors were reminded that the burden of proof was upon the State "to prove the Defendant guilty beyond a reasonable doubt" and that "the evidence in the case must produce in your own mind such a firm belief of guilt that you would be freely willing to act upon that belief in any matter of the highest concern and importance to your own dearest interest." They were also told that because of defendant's plea of not guilty by virtue of unsound mind, the burden was upon the State "to prove beyond a reasonable doubt that the Defendant was sane at the time the crime charged was committed" (Court's Instruction No. 18).

The Court's Instruction No. 20 further protected this petitioner because the jury was instructed that a person must be found not guilty even if "he had the mental capacity to appreciate the wrongfulness of his conduct" if at that time his mind was "so affected as a result of mental disease or defect that he lacked substantial capacity to conform his conduct to the requirements of law."

The Court's Instruction No. 29 admonished the jurors that they must consider the instructions as a whole. In view of these careful instructions, petitioner cannot persuasively contend that State's Instruction No. 5 forced them to find that petitioner had the requisite intent beyond a reasona-

ble doubt. Therefore we conclude that this instruction did not so infect the entire trial as to violate due process and invalidate the state court judgment. *Henderson v. Kibbe*, 431 U.S. 145, 146, 97 S.Ct. 1730, 1732, 52 L.Ed.2d 203. Finally, because the evidence of petitioner's guilt was overwhelming, any error in giving Instruction No. 5 should be treated as harmless. *Holloway v. McElroy*, 632 F.2d 605, 618 (5th Cir. 1980); *United States v. Bohlmann*, 625 F.2d 751, 753 (6th Cir. 1980).

## IV

■ Petitioner's final claim is that there is insufficient evidence to prove beyond a reasonable doubt that he was legally sane and capable of the requisite intent for first degree murder at the time of the homicide, and that his conviction therefore violates the Due Process Clause of the Fourteenth Amendment. Petitioner is not entitled to habeas corpus relief upon this theory unless "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560. As *Jackson* teaches, we must in deciding this issue view the evidence in the state court record in the light most favorable to the prosecution. 443 U.S. at 324, 99 S.Ct. at 2792. We conclude that the record so viewed demonstrates that rational triers of fact could have found petitioner sane beyond a reasonable doubt at the time of the offense.

Since the petitioner denied his guilt by reason of insanity, the State had the burden of proving defendant's sanity at the time of the fatal shooting of his wife. *Riggs v. State*, 264 Ind. 263, 342 N.E.2d 838 (1976). Indiana law on the issue of sanity is controlling. *Moore v. Duckworth*, 581 F.2d 639, 641 (7th Cir. 1978), affirmed, 443 U.S. 713; *Brooks v. Rose*, 520 F.2d 775 (6th Cir. 1975). Indiana jurors are permitted to credit the testimony of lay witnesses as well as expert witnesses as to a defendant's insanity. *Murphy v. State*, 265 Ind. 116, 352 N.E.2d 479 (1976); *Riggs v. State, supra*; *Sotelo v. State*, 264 Ind. 298, 342 N.E.2d 844 (1976). The testimony of eleven lay wit-

nesses for the State indicated that petitioner was sane prior to, during and after the shooting of his wife. In addition, an electroencephalogram technologist at the Elkhart Clinic testified that petitioner told her he returned for a second electroencephalogram because the first test had not shown his insanity, as defense counsel had wished, and that petitioner did not want to go along with an insanity defense. Finally, two experts testified to their opinions that petitioner was sane and capable of forming the requisite criminal intent when the shooting occurred. Thus while petitioner, his mother and two expert witnesses testified to petitioner's inability to form the requisite intent, the jury had sufficient basis to decide the insanity and intent issues against petitioner.

For the foregoing reasons, the judgment of dismissal is affirmed.

## APPENDIX A TO MAJORITY OPINION

The following colloquy between petitioner and Officer Miller was admitted into evidence as containing admissions and denials (R. 592–596):

Mr. Miller: And before we do anything else, we have to advise you of your rights.

Mr. Jacks: This is the first time anyone has advised me of anything.

Mr. Miller: But you have—

Mr. Jacks: And I have been incarcerated for over an hour.

Mr. Miller: You have the right to—

Mr. Jacks: Remain silent.

Mr. Miller: Listen. You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to an attorney and have him present with you while you're being questioned. If you're indigent or poor and cannot afford to hire an attorney, one will be appointed to represent you. At any time during this interview, if you desire not to talk to me, we can stop. Do you understand these rights?

Mr. Jacks: Yes.

Mr. Miller: Having these rights, do you wish to talk to me? You don't have to say anything about anything. Do you understand that?

Mr. Jacks: Sure.

Mr. Miller: Okay, here's your cigarette.

Mr. Jacks: My mother and father are on route from Illinois.

Mr. Miller: Did you call them or what?

Mr. Jacks: Just before I left, yea. They were on route with their own plane. They have their own airplane.

Mr. Miller: They're flying in.

Mr. Jacks: Right.

Mr. Miller: Now, I need to ask you some preliminary questions.

Mr. Jacks: I would like, first of all before we go any further, the officers are running around my house right now. I am not some kind of a machine gun maniac or something like that.

Mr. Miller: Do you have a license?

Mr. Jacks: I am a licensed dealer.

Mr. Miller: We know that. We know that.

Mr. Jacks: I didn't shoot my wife with a machine gun or anything else. And I would like them to understand that they are not scoring on some kind of a lunatic or something like that.

Mr. Miller: I don't think anyone has indicated that, have they?

Mr. Jacks: Well. I just got thrown in the slammer. That's all I know.

Mr. Miller: Well, I think that usually happens, doesn't it, when somebody gets shot? Is that right or wrong?

Mr. Jacks: That's right baby.

Mr. Miller: What is your full name?

Mr. Jacks: Edward Dennis.

Mr. Miller: D–E–N–N–I–S?

Mr. Jacks: Right, Jacks. J–A–C–K–S, Jr.

Mr. Miller: What is your date of birth?

Mr. Jacks: December 20, 1942.

Mr. Miller: You are how old?

Mr. Jacks: Uh, 33?

Mr. Miller: 33. Not quite.

Mr. Jacks: No. My wife passes me up every year, June 28th.

Mr. Miller: She's 33 now? Where do you work?

Mr. Jacks: You know where I work.

Mr. Miller: No, I really don't. You told me—

Mr. Jacks: I've got my own business, and you know exactly what I do.

Mr. Miller: No, I don't.

Mr. Jacks: I'm the police jobber, for firearms. I mean, that's it baby. What do you want me to do?

Mr. Miller: What company, I mean, your own company?

Mr. Jacks: Autoarms is the name of the company. A–U–T–O–A–R–M–S Limited. A–R–M–S. A–R–M–S. Limited.

Mr. Miller: Out of where?

Mr. Jacks: Out of my house.

Mr. Miller: This is your business?

Mr. Jacks: That's it.

Mr. Miller: You are a police arms, what? Supplier?

Mr. Jacks: Right, supplier, supplier. Let's put it that way. If you think I'm going to jump out of this chair here and attack this man, you're out of your mind.

Mr. Miller: Well, we need—We just need these precautions. These are the things that we do anyway.

Mr. Jacks: Listen, I know Robby, Steve Fervida is a personal friend of mine, and I'm not likely to jump out of the window, or jump up and grab this man's radio off this belt.

Mr. Miller: Do you know what has happened? Tonight?

Mr. Jacks: I'm not exactly sure what happened.

Mr. Miller: You're not exactly sure. Have you been drinking?

Mr. Jacks: As regards whatever happened this evening, I want to talk to my attorney.

Mr. Miller: Okay.

## APPENDIX B TO MAJORITY OPINION

The following colloquy between petitioner and Officer Miller was suppressed by the trial court because coming after petitioner's first mention of counsel (R. 349–352):

Mr. Jacks: I'll be delighted to establish who I am, and where I live and what my name is and what my address is and everything else, but I am not going to say anything else.

Mr. Miller: Nothing else. Okay. You have that right.

Mr. Jacks: That's right.

Mr. Miller: So, if you have nothing to tell me other than that, then I'll send you back down.

Mr. Jacks: What do you want me to do?

Mr. Miller: It's up to you. Really.

Mr. Jacks: I want to know how my wife is.

Mr. Miller: Do you have any idea?

Mr. Jacks: Tell me how she is. She was hurt. I put blankets on her and everything else. Listen. This is no foolin' around. Will you find out for God's sake . . . how she is.

Mr. Miller: You want to find out?

Mr. Jacks: Yes, I do.

Mr. Miller: What's your home telephone number?

Mr. Jacks: You don't think she's at home, do you?

Mr. Miller: No, but there are people there.

Mr. Jacks: 246–1082

Mr. Miller: (Dials number)

(Security Radio Interjects)

Mr. Jacks: What?

Mr. Miller: Ah, he's a radio. He's got an internal radio.

Mr. Jacks: I heard that. What did they say?

Mr. Miller: No. Middlebury is bringing in a female juvenile. (Talking on telephone) Is Snyder there? Bud Miller.

Mr. Jacks: Can't you check with the hospital or something, I mean—

Mr. Miller: They will know there, I'm sure.

(Security Officer Paine Tells Another Security Officer, "Steve, I'll be on second floor for a while."

Inaudible reply on radio. Paine replies, "Yea.")

Mr. Miller: How many do you have on duty? (talking to Paine)

Mr. Paine: Two.

Mr. Jacks: Can I have a glass of water? Can I have a glass of water, please?

Mr. Miller: Just a minute. There's a fountain at the end of the hallway. We'll get a drink when we go back down.

(Radio Traffic In Background)

Mr. Jacks: Am I accused or charged with something?

Mr. Miller: I would say so, yes.

Mr. Jacks: (Inaudible)

Mr. Miller: I don't have the charge but I would imagine the charge right now is Assault and Battery with the intent to commit a felony.

(Radio Paging Tone And Radio Traffic)

Mr. Miller: (Still on telephone) Yes, Terry? I have Mr. Jacks in my office. He has been advised of his rights. He wishes to con, confer with an attorney. Do you know what the condition is of his wife? She is dead. Okay. Okay. Okay. Okay. Oky-doak. Oky-doak. Okay. Alright. Okay. Alright. Alright. Goodbye. (Talking to Mr. Jacks) Do you understand that, Mr. Jacks? That your wife is dead? Do you wish to call an attorney?

Mr. Jacks: All I know at this point is that my mother and father are flying down here to talk with me. That's all that I know.

Mr. Miller: Okay, do you wish to call an attorney?

Mr. Jacks: No.

Mr. Miller: You do not wish to—

Mr. Jacks: No.

Mr. Miller: Call an attorney.

Mr. Jacks: I appreciate your advice, but I don't. Because I don't have an attorney here and—

Mr. Miller: Okay, then we'll go back downstairs.

Mr. Jacks: I don't know what to do.

Mr. Miller: I don't either. But the charge, you are being charged with first degree murder.

Mr. Jacks: I understand that.

Mr. Miller: You understand that?

Mr. Jacks: I understand that.

Mr. Miller: Okay. Let's go downstairs. The time of this recording is 7:00 P.M., August the 28th, 1975. Present were Sergeant Marlin W. Miller and Security Officer Charles Paine. Accused was advised of his rights and desired to have an attorney before talking to the police.

## APPENDIX C TO MAJORITY OPINION

*Court's Instruction No. 13*

The Court instructs you that it is unlawful to intentionally commit an act forbidden by law which takes the life of another human being, unless the act is justified or legally excused, and the intent to do the act is criminal and imparts to said act the character of an offense, and one who violates the law, which he is conclusively presumed to know, cannot be heard to say that he had no criminal intent in doing the forbidden act.

Every man is presumed to intend the natural consequences of his acts, and when one does an illegal act, he is responsible for all the consequences that legitimately flow therefrom.

*State's Instruction No. 4*

You are instructed that the criminal law is an expression of the community's conscience or moral sense. It is important, therefore, to remember that when considering a defense to criminal responsibility, the mere proof that a certain mental condition existed at the time of the act, or that there is some causal connection between the mental state of the Defendant and the act itself is not enough. Rather there must be a showing that the Defendant's mind was so affected, he failed to recognize and appreciate his duty to society or complying with its code of acceptable behavior or that appreciating such fact, he lacked the capacity to conform his conduct to such requirements.

You are further instructed that to be responsible within the meaning of the term "criminal responsibility" means (1) to be able to recognize and discharge various

duties and (2) to be morally censurable for the voluntary breach of those duties and legally liable if their violation is forbidden by law.

*State's Instruction No. 5*

You are instructed that where a specific intent is required to make an act an offense, such as in the charge preferred against the Defendant, it is not always possible to prove a purpose by direct evidence, for purpose and intent are subjective facts. That is, they exist within the mind of man, and since you cannot delve into a person's mind and determine his purpose and intent, you may look to all the surrounding circumstances, including what was said and done in relation thereto; bearing in mind the presumption of law, that every one is presumed to intend the natural and probable consequences of his voluntary acts, unless the circumstances are such as to indicate the absence of such intent.

When an unlawful act, however, is proved to be knowingly done, no further proof is needed on the part of the state in the absence of justifying or excusing facts, since the law presumes a criminal intent from an unlawful act knowingly done.

SWYGERT, Circuit Judge, dissenting.

Edward Dennis Jacks has presented two grounds that necessitate the grant of his petition for a writ of habeas corpus. The use of State's Instruction No. 5 is a particularly egregious error made by the state trial court, for it impermissibly shifted the burden of proof on an essential element of the crime. In addition, the admission into evidence of his request to speak to a lawyer conflicts with numerous opinions of the Supreme Court and of this circuit.

I

The majority's holding that permits the use of State's Instruction No. 5 creates a dangerous precedent that shatters the foundation of our criminal justice system: that every person is presumed innocent unless proven otherwise beyond a reasonable doubt. The trial judge instructed the jury that there is a "presumption of law, that every one is presumed to intend the natural and probable consequences of his voluntary acts, unless the circumstances are such as to indicate the absence of such intent." The majority must concede that absent the final phrase, the instruction would be identical to the instruction that was condemned in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[1] The majority relies on this final phrase and on other language in the instruction that the jury could look to surrounding circumstances and that any presumption of criminal intent may be rebutted by "justifying or excusing facts." They hold the instruction valid because the qualifying phrases and the tenor of other instructions "nullified the mandatory flavor of the language condemned in *Sandstrom*."

This holding ignores the nature of the two-part analysis in *Sandstrom*. The jury in that case might have interpreted the instruction given either as one creating an irrebuttable presumption or as one shifting the burden of proof to the defendant.[2] The Court held the instruction to violate the Due Process Clause under *either* interpretation. If the jury thought the presumption was mandatory, the instruction "'would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.'" *Id.* at 521–523, 99 S.Ct. at 2458–2459, quoting *Morissette v. United States*, 342 U.S. 246, 275, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952).[3] If the jury believed the presumption to be rebuttable, the instruction would still be invalid, for, as the Court explicitly held in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d

---

1. The instruction in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) reads: "[T]he law presumes that a person intends the ordinary consequences of his voluntary acts."

2. *Id.*, p. 517, 99 S.Ct., at p. 2455.

3. *See also United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978).

368 (1970), "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact *necessary to constitute the crime with which he is charged.*" (emphasis added)[4]

The Court in *Sandstrom* followed several previous cases concerning instructions that had shifted the burden of proof to the defendant. In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court held unconstitutional an instruction that permitted the inference of malice if the jury found the homicide in question was both intentional and unlawful, unless the defendant showed by a preponderance of the evidence that the crime had been committed in the heat of passion on sudden provocation. Under Maine law, malice was an essential element of the crime of murder. By requiring the defendant to prove he had acted in the heat of passion, the Maine rule shifted to the defendant the burden of proof on the question of malice, which was a "fact necessary to constitute the crime with which [defendant] was charged."[5] The Court held the Due Process Clause precluded any such shift on an essential element of the crime. If the defendant raised the heat of passion as a defense, the State would have to bear the burden of proving its absence.[6]

The Supreme Court has permitted a shift in the burden of proof only with respect to factors that did not constitute elements of the crime charged. In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court held that New York did not violate the Due Process Clause by requiring a murder defendant to prove by a preponderance of evidence the affirmative defense of extreme emotional disturbance to reduce the crime to manslaughter. In New York, there were only two elements to the crime of second-degree murder: (1) "intent to cause the death of another person," and (2) "caus[ing] the death of such person or of a third person."[7] Malice aforethought was not an element of the crime. The statute provided that a defendant could reduce the charge to manslaughter if he proved that he had "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse."[8] Because the State had proved the two necessary elements of second-degree murder in *Patterson,* the Court held that due process did not require it to prove the absence of the affirmative defense.

In so ruling, the Court relied on *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), which had held that Oregon could shift the burden of proof on the insanity defense so long as the state had already proved beyond a reasonable doubt every element of the crime, including premeditation and deliberation.[9] The Court succinctly stated the distinction between *Patterson* and *Leland* on the one hand and *Mullaney* and *Sandstrom* on the other. Under *Patterson* and *Leland,*

> once the facts constituting a crime are established beyond a reasonable doubt, based on all the evidence including the evidence of the defendant's mental state, the State may refuse to sustain the affirmative defense of insanity [or extreme emotional disturbance] unless demonstrated by a preponderance of the evidence.

*Patterson, supra,* 432 U.S. p. 206, 97 S.Ct. p. 2324. The burden could not be reversed, however, on any of the facts constituting the crime.

These cases demonstrate that the majority's analysis of *Sandstrom* is misplaced.

---

4. *Sandstrom, supra,* 442 U.S. p. 524, 99 S.Ct. p. 2459.

5. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

6. *See also Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (instruction reversing burden of proof on issue of self-defense invalid under *Mullaney*).

7. N.Y. Penal Law § 125.25 (McKinney 1975).

8. *Id.*

9. *See also Rivera v. Delaware,* 429 U.S. 877, 97 S.Ct. 226, 50 L.Ed.2d 160 (1976) (appeal claiming that the *Winship* and *Mullaney* decisions had overruled *Leland* dismissed as not presenting a substantial federal question).

*Sandstrom* did not overturn the instructions in that case because they created a conclusive rather than a rebuttable presumption. The Court held the instruction unconstitutional because it shifted the burden of proof on intent, an essential element of the crime charged.[10] The instruction in this case suffers the same infirmity, for it reverses the burden of proof on intent. The instruction tells the jury that "one is presumed to intend the natural and probable consequences of his voluntary acts, *unless* the circumstances are such as to indicate the absence of such intent." (emphasis added) As the majority notes in its opinion, *supra*, p. 485, "the jurors were told ... that any presumption of 'a criminal intent from an unlawful act knowingly done' was *rebuttable* by 'justifying or excusing facts.'" Because under Indiana law intent is one of the constituent elements of first-degree murder,[11] the crime for which Jacks was convicted, the reversal of the burden of proof on that issue violated his Due Process rights. We cannot be sure that the text of the other instructions mitigated the effect of the improper language in Instruction No. 5. As *Sandstrom* points out, "even if a jury *could* have ignored the presumption and found defendant guilty because he *acted* knowingly, we cannot be certain that this is what they *did* do." *Id.* 442 U.S. p. 526, 99 S.Ct. p. 2460 (emphasis in original). The

petition for a writ of habeas corpus should therefore be granted.

## II

I must also dissent from the majority's holding that the admission into evidence of petitioner's request for counsel was not prejudicial error. The majority's attempted distinction of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), is faulty. The opinion states that the two cases are inapplicable because the prosecution, in introducing the tape-recorded conversation, was not attempting to use petitioner's silence against him.[12] If that statement were true, then there would not have been any reason to have played the recording for the jury. During the conversation, Jacks never told the police anything except basic information such as his name, age, address, and occupation. Any reading of the transcript in Appendix A would show that the only reason to introduce the tape into evidence was to inform the jury that Jacks had said he would not talk to the police until he had spoken to his lawyer. None of the rest of the conversation was at all useful to the jury.

A request for an attorney is extremely prejudicial in a case involving an insanity defense.[13] The case is indistinguishable

10. The Montana statute under which *Sandstrom* was prosecuted reads in relevant part:

   (1) [C]riminal homicide constitutes deliberate homicide if:

   (a) it is committed purposely or knowingly; or

   (b) it is committed while the offender is engaged in or is an accomplice in the commission of, an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape, or any other felony which involves the use or threat of physical force or violence against any individual....
   R.C.M. § 94–5–102 (1977).

11. The Indiana murder statute reads,
   A person who:
   (1) Knowingly or intentionally kills another human being; or

   (2) Kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery; commits murder, a felony.
   I.S.A., Crimes, § 35–42–1–1 (Burns 1979).

12. Majority opinion, *supra*, p. 483.

13. The majority states, *supra*, n. 1, that any error in the admission of this statement would be harmless. The footnote does not cite any opinion that so holds. Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Considering the sanctity of *Miranda* rights (*see* n. 16 below) and the prejudice to the defendant in this case, I believe

from *United States v. Matos*, 444 F.2d 1071 (7th Cir. 1971), in which this court held that the introduction of a postal inspector's testimony that the defendant "indicated he did not want to make a statement" was plain error, and from the *Doyle* and *Hale* decisions.[14] If Jacks had said no more than, "I would like to speak to a lawyer," then there is no doubt that this statement would not be admissible.[15] The mere fact that he had answered a few innocuous questions before he made that statement should not render his request for counsel admissible; nor should such trivial responses amount to a waiver of his constitutional right to remain silent. Similarly, the fact that Jacks testified freely at *trial* is irrelevant to his request for counsel at the time of his *arrest*. *Miranda* rights are too sacred and too fundamental as protection of the guarantee of a fair trial to rest upon so unstable a foundation.[16]

### III

While I agree with the majority that *Hussong v. Warden*, 623 F.2d 1185 (7th Cir. 1980), controls our decision on the issue of admission into evidence of the illegally-recorded conversation between Jacks and his mother, I would like to add two comments regarding that portion of the opinion.

The trial judge's instruction to the jury that it could consider the contents of the tape for the question of petitioner's sanity, but not as to whether Jacks had committed the crime charged, is gross error. The only issue in the case was Jacks' sanity. He admitted that he had committed the act that resulted in his wife's death, but he only could have been guilty of the crime charged if he was in fact sane. The trial court's instruction therefore permitted the jury to consider the contents of the tape on the ultimate issue in the case. As the majority notes, however, under *Hussong*, this error does not constitute grounds for granting the writ of habeas corpus.

Furthermore, *United States v. Stewart*, 443 F.2d 1129 (10th Cir. 1971), is not at all authority on this question. That case concerned the admissibility of lay testimony on the issue of sanity and also the sufficiency of evidence of mental capacity. The admissibility of the tape-recorded conversations was never in dispute in the case. The statement quoted by the majority, *supra*, p. 484, concerning the conversations' probative effect is dictum and had little to do with the decision in the case.

I would grant the writ of habeas corpus for the reasons discussed in parts I and II of this dissent.

---

this error necessitates that the petition for a writ of habeas corpus be granted. *United States v. Matos*, 444 F.2d 1071, 1073–74 (7th Cir. 1971).

**14.** *See also United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968).

**15.** *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Baker v. United States*, 357 F.2d 11 (5th Cir. 1966).

**16.** The sanctity of *Miranda* rights was recently reaffirmed by the Supreme Court in *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (Once a defendant has invoked his right to counsel, police may not initiate further interrogation in counsel's absence.), and in *Estelle v. Smith*, —— U.S.——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The majority's attempted distinction of *Edwards* suffers the

---

same infirmities as the faulty distinctions of the *Doyle* and *Hale* cases.